[No. 12533.  *En Banc.*  January 11, 1916.]

TACOMA MILL COMPANY, *Appellant*, v. NORTHERN PACIFIC
RAILWAY COMPANY, *Respondent.*[1]

CONTRACTS—CONSTRUCTION—IN PARI MATERIA.  Where a written
agreement refers to a right of way deed between the parties, and the
deed refers to the written agreement, in recital of its consideration
and purposes, the two must be considered *in pari materia.*

DEEDS—CONSTRUCTION—INTENTION—UNAMBIGUOUS WORDS.  While
the contract must be read as a whole and the general design must
not be frustrated by allowing too much force to single words or
clauses, the controlling canon for the interpretation of deeds, if un-
ambiguous, is to ascertain the intention of the grantor from the
words employed.

RAILROADS—RIGHT OF WAY DEED—CONSTRUCTION—USE—PURPOSES
AUTHORIZED.  A right of way agreement and deed for a railroad com-
pany's "Bay Side extension" along the water front of a large city,
"for railway and similar purposes," through the grantor's mill prop-
erty, in consideration of certain privileges, the railroad company
agreeing to erect a fireproof tunnel, and maintain grade crossings
and a switch and free switching service for the sole use of the
grantor, being unambiguous and without any reservations or limita-
tions as to the number of trains to be run or the right to extend the
branch line to any other point should it be found necessary, will not
be construed to limit the company to the use of the way for a branch
freight line to serve local industries, for which it was originally
constructed, and the grantor cannot object to the company's use of
the extension as a part of its main line upon making a necessary
change in the main line route, merely because some of the grantor's
privileges will be curtailed or destroyed by such extended use of the
way; since it was obvious that the "Bay Side extension" was more
than a mere side track or industrial spur, and that the growth of the
city and location of numerous industries might compel almost con-
tinuous use of the branch, and the legal effect of the grant was that
the land may be used for such legitimate railroad and public pur-
poses as the future necessities and convenience of the public re-
quired, and that the compensation received by the grantor was full
indemnity for such uses.

EVIDENCE—PAROL EVIDENCE—TO VARY WRITING—INTENT.  Extrinsic
evidence is not admissible to show an intent to limit or restrict the
unambiguous absolute grant in a right of way deed for the com-

[1]Reported in 154 Pac. 173.

pany's "Bay Side extension" "for railway and similar purposes," no fraud or mistake being claimed, the parties having dealt at arm's length and the contract being drawn by competent counsel and fully considered; since all negotiations and limitations that might readily have been expressed must be considered merged in the final agree· ment.

MORRIS, C. J., and CHADWICK, J., dissent.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered November 12, 1914, in favor of the defendant, dismissing an action for equitable relief, tried to the court. Affirmed.

*Hughes, McMicken, Dovell & Ramsey,* for appellant.

*Geo. T. Reid, J. W. Quick,* and *L. B. da Ponte,* for respondent.

HOLCOMB, J.—Negotiations initiated September 2, 1887, by respondent's predecessor, Northern Pacific Railroad Company, and carried on between it and appellant, resulted in an agreement and deed to the railroad company for a right of way through appellant's premises. The original agreement was drawn up in writing and, passing from hand to hand and from party to party, was mislaid and lost a number of times before it was fully executed by the signatures of both original parties. Subsequent negotiations were had from time to time, during many years, to restore the original agreement, which finally culminated in an agreement which was formally made and executed in writing by the present railway company, respondent, and appellant, in the following terms:

"R. W. No. 33.

"This Indenture, Made this 24th day of January, A. D. 1906, by and between the Tacoma Mill Company, a corporation duly incorporated under the laws of the state of California, and doing business at Tacoma, in the state of Washington, the party of the first part, and the Northern Pacific Railway Company, a corporation incorporated under the

laws of the state of Wisconsin, the party of the second part, Witnesseth as follows:

"Whereas in the month of May, A. D. 1888, the said party of the first part made an agreement with the Northern Pacific Railroad Company, then duly incorporated and organized as a railroad corporation, under an act of Congress of the United States approved July 2, A. D. 1864, which said agreement was never executed, and was in words and figures following, to-wit:

"This agreement, made and entered into this .... day of May, A. D. 1888, by and between the Tacoma Mill Company, a corporation duly incorporated under the laws of the state of California, the party of the first part, and the Northern Pacific Railroad Company, a corporation duly incorporated by act of Congress approved July 2nd, A. D. 1864, Witnesseth:

"Whereas, the said parties to this agreement heretofore, to-wit, on April 20th, 1888, by their respective attorneys thereunto duly authorized, executed a certain memorandum of agreement, relative to a right of way to be granted through the mill property of the said party of the first part, in the city of Tacoma, Pierce county, Washington Territory, for what is known as the Bay Side extension of said company's railroad along the water front of Commencement Bay, and which said agreement provided for the execution of and delivery of a deed by said party of the first part, conveying to said party of the second part the said right of way, for the consideration and upon the conditions and with the reservations therein and hereinafter set forth, and which said agreement also provided that a contract should be entered into by and between said parties in proper form setting forth the contents of said memorandum, and the conditions upon which said right of way was granted, and all the agreements, covenants and stipulations of the parties relating thereto.

"And whereas, the said party of the first part has this day duly executed said conveyance of said right of way to be delivered to said party of the second part upon its execution of this agreement, which said right of way is located upon a strip of land twenty (20) feet in width (being ten [10] feet in width on each side of the center of said proposed line of railroad as surveyed and laid out, and hereafter to be constructed) across the lands in section twenty-nine (29), township

twenty-one (21) north, of range three (3) east, W. M., owned by the Tacoma Mill Company, the center line of said strip of land beginning one hundred (100) feet east and sixty-nine and thirty-one one-hundredths (69.31) feet north from where the center line of Second street, in Tacoma, W. T., intersects the western boundary of section twenty-nine (29), township twenty-one (21) north, of range three (3) east, W. M., running thence south 76° 25′ east, two hundred and six-tenths feet; thence on a 7° curve to the right two hundred and twenty-six and two-tenths feet; thence south 60° 35′ east two hundred and eighty feet; thence on a 12° 30′ curve to the right one hundred and sixty feet; thence south 40° 35′ east, one hundred feet; thence on a 12° 30′ curve to the left to a point one thousand two hundred and fifteen feet east of the western boundary of section twenty-nine (29) aforesaid, assuming said western boundary of section twenty-nine a meridian of reference in the foregoing description; and it is to be held by said second party as in said conveyance is set forth.

"Now, therefore, in consideration of the premises, and to carry out said memorandum agreement the parties hereto agree as follows:

"First: The said Northern Pacific Railroad Company shall enclose their track and roadway to be laid and located upon said right of way with a good house or tunnel, constructed of iron or other fireproof material, and shall occupy· in construction, as little room as possible; the said tunnel shall begin near the eastern boundary of said mill company's property, not exceeding twenty feet west of gate leading to log pond, and to continue on through the property with said house or tunnel as the said mill company may direct; said tunnel shall not exceed nineteen feet in the clear above the rails, and is to be kept and maintained in good and safe condition by said railroad company and at its expense, and said track and roadway across said mill property must be established at such a grade so that said tunnel, when constructed, will clear the chutes and other connections with said mill as the same shall be altered to provide for said construction, and will not interfere with the operation of said mill.

"Second: The railroad company shall repair or replace as the case may be, all chutes and roadways leading to and ·

from the mill, machine shops, mess house and other buildings on said mill company's property, wherever the same are in any way impaired or torn away in course of construction of said railroad, and shall put said chutes and roadways in as good working order or condition as they were before said interference with the same before construction, or shall bear the expense of so doing; the planer mill to be added to where any portion is removed or taken away in construction, and the planers moved and put in as good working order as they were before removal, at the expense of said railroad company.

"Third: The line of said railroad is to pass within eight (8) feet of the gate leading to log pond, and said railroad company is to construct a span sufficiently long so as not to interfere with the booming privileges or the sluicing of· logs through said gate into the log pond, but said span not to exceed fifty (50) feet in length; thence in a westerly direction, the said line passing the mill and machine shop with as little damage thereto as possible; after passing said machine shop line of railroad to be as near the bank as possible.

"Fourth: The said Northern Pacific Railroad Company shall remove so much of the western end of the two railroad tracks, and trestle on which same are laid, lying east and adjoining the mill property as is situate upon lots one and two of the water front lots of the Northern Pacific Railroad Company hereinafter mentioned; the space so vacated, to-wit: the western end of what is known and designated as lots numbered one (1) and two (2) on the map called the map of the water front lots of the Northern Pacific Railroad Company, which said map is to be found in the office of the assistant general manager of the said railroad company at Tacoma, Washington Territory, and a blue ·print copy of which was furnished on or about April 20th, 1888, to said mill company to identify said lots, the said lots being at the western extremity of the property of the Tacoma Dock and Warehouse Company on said water front. And said railroad company shall in due form execute and deliver a lease of said lots to said mill company, to have and to hold the same for its sole use as a dumping or booming ground for its logs, free of any rental charge, and to be used and occupied for such purpose by said mill company as long as the said railroad company shall use the property granted by said mill company as a right of way for railroad or other purposes, and the delivery

of said lease shall be concurrent in point of time with the delivery of said deed.

"Fifth: It is also agreed that the wagon road now leading from the mill property in a westerly direction across the property of the Tacoma Land Company, and connecting with Second street, in the town of Old Tacoma, shall remain and be kept open in its present location, and to the extent of its present width (thirty feet) until such time as such other wagon road or street shall be opened up through said property leading from the mill property and connecting with Second street, as shall equally as well, or better, accommodate and suit the convenience of said mill company in reaching points west of their mill property in Old Tacoma, by wagon road; and that the railroad company shall put in and maintain a good and sufficient crossing for said road.

"Sixth: The said Northern Pacific Railroad Company shall also put in and maintain in said tunnel as many doors, openings or gangways leading to and from the mill, machine shop and other buildings, as may be necessary in adapting to the successful operation of said mill, and its business, the obstruction caused thereto by the construction of said tunnel. The said Northern Pacific Railroad Company shall also put in and maintain a side track or spur for the sole use and benefit of the mill company in shipping or receiving lumber or goods, said spur to leave the main track at a point beginning opposite to the western end of the machine shop and extending northwardly and westwardly, in a parallel direction with said main track, over the western portion of said mill company's property to a point on the western line of the mill company's property a distance of five hundred feet. The said railroad company also shall do all switching of cars necessary in the use of said railroad in the carriage or moving of said mill company's lumber or goods to and from said mill, free of any charge to the said mill company so long as the line of said railroad over and through said mill property shall be used and operated by said railroad company, and while the said right of way is used by it for a railroad or other purposes. Said switching to be done promptly, as the business of said mill company shall require; provided, however, that in all cases of switching referred to, it is to be understood that the switching to be done free is for business that has reached the city of Tacoma by the Northern Pacific Railroad

and for business originating at the mill company's mill to be shipped out by way of the Northern Pacific Railroad.

"Seventh: All foundations to mill or shops disturbed by said railroad company in the construction of said road shall be renewed or thoroughly repaired; the removal or altering of chutes made necessary in the construction of said line to be made so as not to interfere with the operation of the mill; that is to say, the change to be made either when the mill is idle, or so made as to change one chute at a time, so as not to in any way delay the work of the mill by making said change; all buildings damaged or removed by the railroad company to be fully repaired or moved at the expense of the said railroad company. That the mill company shall have the right, at all times, to cross the track and roadway either over or under the track of said railroad, with any water, sewerage or steam pipes; and that the work of crossing the property and making the changes, building tunnel, etc., by the railroad company shall be completed within sixty (60) days after the commencement of the work.

"Eighth: And the said railroad company hereby agrees to well, truly and faithfully keep and perform each and all of the agreements, stipulations and conditions by it to be kept and performed as herein stated, and that this contract and the deed to be executed and delivered by said Tacoma Mill Company, in pursuance thereof, shall be considered and taken as one transaction, and that said railroad company accepts said grant of said right of way upon the conditions and with the reservations herein set forth.

"Ninth: Two blue maps, one being a plat showing the location of the Northern Pacific Railroad Bay Side Extension through the Tacoma Mill Company's property, and the other being a map of the water front lots, showing proposed railroad tracks of the Northern Pacific Railroad Company, at Tacoma, and showing the location of said lots one (1) and two (2) herein set apart for the use of the Tacoma Mill Company for dumping and booming purposes, and which were furnished by said railroad company to said mill company on or about April 20th, 1888, are hereby referred to as illustrating the situation of the premises in question, and by such reference are made a part hereof.

"And whereas said Northern Pacific Railway Company, said party of the second part, is the successor in interest of

7—89 WASH.

said Northern Pacific Railroad Company, and has acquired its property, including the right of way referred to in said agreement of May, 1888, and has agreed to fulfill the terms and conditions thereof, and has ratified the said agreement;

"Now, therefore, the said Tacoma Mill Company, party of the first part, for and in consideration of one dollar, and other good and valuable consideration, the receipt whereof is hereby acknowledged, does hereby grant to the said Northern Pacific Railway Company, said party of the second part, the right of way for railroad or other similar purposes, over certain real property owned in fee by said party of the first part, situate in Pierce county, state of Washington, and particularly described as follows:

"A strip of land twenty (20) feet in width through section twenty-nine (29), township twenty-one (21) north, range three (3) east of the Willamette Meridian, being ten (10) feet on each side of the center line of said railway, as now constructed and operated and described as follows: Beginning at a point marked by a monument, eight-four and seventy-six hundredths (84.76) feet north, and one hundred (100) feet east of the intersection of center line of North Thirtieth (30) street in the city of Tacoma, Washington, and the western boundary line of section twenty-nine (29), township twenty-one (21) north, range three (3) east of the Willamette Meridian; thence on a curve to the left of five hundred seventy-three and sixty-nine hundredths (573.69) feet radius, a distance of one hundred thirty-two (132) feet, said curve being a tangent at its point of beginning to a line bearing south sixty-three degrees (63°) twenty-six minutes (26') east, thence south seventy-six degrees (76°) forty minutes (40') east a distance of one hundred thirty-three and nine-tenths (133.9) feet, thence on a curve to the right of eight hundred nineteen and two hundredths (819.02) feet radius, a distance of two hundred twenty-seven and four-tenths (227.4) feet, thence south sixty degrees (60°) forty-five minutes (45') east a distance of two hundred seventy-six and five-tenths (276.5) feet, thence on a curve to the right of four hundred fifty-nine and twenty-eight hundredths (459.28) feet radius, a distance of one hundred fifty-three and six-tenths (153.6) feet, thence south forty-one degrees (41°) thirty-three minutes (33') east a distance of one hundred twenty-four and one-tenth (124.1) feet; thence on a

curve to the left of four hundred fifty and eighty-nine hun-
dredths (450.89) feet radius a distance of two hundred
forty-five and six-tenths (245.6) feet to a point marked by
a monument, which monument is located three hundred and
fifty-three and four one-hundredths (353.04) feet north of
the south boundary line of section twenty-nine (29), town-
ship twenty-one (21) north, range three (3) east, Willamette
Meridian, when measured at right angles thereto, from a
point located in said south boundary line, one thousand two
hundred and fifteen (1,215.0) feet east from the southwest
corner of said section twenty-nine (29) when measured along
the south boundary line of said section.  Assuming said west-
ern boundary of said section twenty-nine (29) as a meridian
of reference in the foregoing description.

"To have and to hold the said described property to the
said party of the second part, as long as the said party of
the second part, its successors and assigns, shall use the
same as a right of way for railroad or other similar purposes.

"This deed is made upon the express condition and upon
the understanding of both parties hereto that the property
herein conveyed shall be used by the said party of the second
part, its successors and assigns, for the uses and purposes
above stated, and shall be null and void, and the land herein
conveyed shall revert to the said party of the first part, its
successors and assigns, if the said party of the second part,
its successors or assigns, shall transfer, lease, sell or convey
the said right of way, or any part thereof hereby granted,
for any other purpose excepting as above stated, to any other
party, without the written consent of the president of the
said Tacoma Mill Company.

"The party of the second part accepts the deed, and here-
by covenants and agrees that it will pay promptly when they
may fall due all taxes and assessments against the said right
of way premises hereinbefore conveyed, and every part of the
same, as long as said party of the second part shall occupy
said premises as a right of way for railroad or other purposes.

"The covenants and conditions herein and in said agree-
ment shall be binding and inure to the benefit of the successors
or assigns of each party hereto, and each and all of the cov-
enants in said agreement shall be deemed as covenants run-
ning with the land hereby conveyed, and shall be binding and

obligatory upon the respective successors and assigns of each of the parties hereto.

"In Witness Whereof, the parties hereto have caused these presents to be executed in their corporate names, by their duly authorized officers, and their corporate seals to be hereto affixed, this 24th day of January, 1906.

"Attest:                          Tacoma Mill Company,
    (Seal)                        By H. C. Chesebrough,
"Jno. W. Classen,                          Its President.
    "Secretary.
"Attest:          Northern Pacific Railway Company,
    (Seal)                        By Howard Elliott,
"R. H. Relf, Assistant Secretary.          Its President."

On the same date as the original agreement, May 26, 1888, a deed of the right of way granted to respondent's predecessor was executed but not delivered by appellant, the material part of which is as follows:

"In consideration of the execution this day by the party of the second part of a certain collateral agreement of even date herewith, made and entered into with said party of the first part relative to the right of way hereinafter granted, and defining their rights and obligations of each of the parties to said agreement respecting said right of way, and stating the conditions and reservations upon and with which the said right of way is granted, the said party of the first part has bargained, sold, conveyed and confirmed, and by these presents does bargain, sell, convey and confirm to the said party of the second part, its successors and assigns, the following described tract of land, as a right of way for the construction, operation and maintenance on, across over and through the same by the Northern Pacific Railroad Company, of a standard gauge track railroad, to be used and operated as the Bay Side extension of said company's railroad along the waterfront of Commencement Bay, in the city of Tacoma, Pierce county, Washington Territory, situated and more particularly described as follows, to-wit:" (Then follows description by metes and bounds.)

The original agreement made on May 26, 1888, as was said, was mislaid a number of times before signing by both parties, and it required about eighteen years to bring about

a formal restoration of the original agreement from the office copies of the parties at the time, and the execution of the formal writing of January 24, 1906, by both parties, expressing, as might be supposed, the meeting of their minds.

The history of the transaction, as shown by the record, discloses that very eminent and able counsel, among whom were the late H. G. Struve, Mr. Ashton, and the present senior member of the appellant's firm of counsel, acted in the matter for appellant; Mr. McNaught and Mr. Mitchell, former counsel for respondent's predecessor, and Mr. Grosscup, former counsel for respondent, all had much to do with the preparation of the writings, and carefully examined and considered them before their final approval and execution. Notwithstanding all this, it is now contended by appellant that the writings are open to construction and subject to evidence as to the intention of the parties to the agreement.

It will be observed that the written agreement refers to the right of way deed given by appellant to respondent, and the deed also refers to the written agreement of the parties, in recital of its consideration and purposes. The two instruments must, therefore, perforce be considered *in pari materia.*

Broadly and briefly stated, the issue between the parties is, whether the easement granted and conveyed by the mill company is an absolute and unqualified grant of the described right of way for any and all railway and other similar purposes within the railway company's public and corporate powers, or whether it contemplated merely a limited and qualified easement of the right of way for the uses and purposes of the so-called "Bay Side Extension" of the railway company, to be used for a freight and industrial track only.

The pleadings are voluminous and cannot be extensively set out without making this opinion much too long. The complaint proceeds upon the theory that it was represented by respondent's predecessor, and understood and agreed upon by and between the parties, that the Bay Side extension of

the railway was to be constructed along the water front of Commencement Bay, in the city of Tacoma, over and across appellant's property, solely for the accommodation of the property owners and industries then or thereafter to be located along the water front, and that the engines and cars of the railway would only pass over the road as often as necessary to get freight and do switching for such property owners and industries; that now the railway company has extended its line from the former terminus of the Bay Side extension as then constructed, and maintained and operated for a period of over twenty years, a number of miles to Tenino on its old main line; that the railway company intends and threatens to operate all its trains between Tacoma and Portland and intervening points and all points in Southwestern Washington, save and except such freight and passenger trains as it may be necessary to run over the heretofore existing main line to take care of local business between Tacoma and the point of intersection with the new line; that it is its further intention to contract for its own profit with the Oregon-Washington Railroad & Navigation Company and the Great Northern Railway Company, heretofore using the existing main line between Tacoma and Portland, by which the last named companies will operate their trains from Tacoma to Portland through the premises of appellant over the new line; that appellant will be irreparably injured by such intended and threatened additional uses and burdens, for which it cannot be adequately compensated in damages; for which appellant prays injunctive and other equitable relief.

The respondent traverses the appellant's allegations as to the representations, understanding, and agreement alleged to have been made by and between the parties, other than as shown and fully expressed in the written agreement and right of way deed set up by appellant; admits that it has constructed and intends to use for its general railroad purposes the extension of its "Bay Side Extension" to Tenino;

that it has agreed with the Oregon-Washington Railroad &
Navigation Company to allow it the joint use of the track
for a valuable consideration; that it has granted the Great
Northern Railway Company five years within which to de-
termine whether it will desire the use of the track over which
to run its trains between Tacoma and Portland under a joint
operation contract, but that that line has so far declined such
offer and signified no intention to enter into such an arrange-
ment; it denies the allegations of the complaint as to irre-
parable injuries and damages and possible future injuries,
hazard and damages.

Respondent further affirmatively alleges that it is the
grantee and successor in interest of the Northern Pacific
Railroad Company, and of all its property, franchises, and
rights, including the right of way in controversy; that the
track constructed and operated upon that right of way was
in no sense a spur track or siding; that the growth of the
population served by respondent's railway system, and of
its business as a common public carrier, has made it neces-
sary for it to increase its carrying capacity and facilities,
and to use the right of way in question for main line pur-
poses; that it is so authorized and empowered by the instru-
ment of conveyance from appellant, dated January 24, 1906,
and that such use is in no way inconsistent with the terms of
that instrument, or in violation thereof. It further alleges
in its answer that the growth of population, business, and
traffic created an existing public necessity that the respond-
ent construct, maintain, and operate what it calls its "Point
Defiance Grade Line" from Tacoma to Tenino, for the pur-
pose of eliminating grades and curves in its old main line,
and to use as a part of the "Point Defiance Grade Line" the
right of way over and across appellant's property as con-
veyed to respondent; that it has constructed the "Point De-
fiance Grade Line" at a cost of many million dollars, and
that the public interests and necessities require its operation.

There are further affirmative allegations in the answer not now necessary to notice; all of which were put in issue by the reply. Testimony was introduced by each party supporting its allegations, over the objection of the opposite party.

Ever since the execution of the contract on January 24, 1906, the respondent has maintained and operated the Bay Side extension through the tunnel across appellant's premises, as a freight track, to serve the industries situated along the water front of Commencement Bay between the main terminus of the original railroad and the Tacoma smelter. It has in the meantime constructed a double-track branch line from its main line at Tenino, in Thurston county, to the east shore of Puget Sound, and thence northerly along the shore to Point Defiance, and thence has constructed a double-track tunnel 4,500 feet in length through Point Defiance to the northwesterly shore of Commencement Bay, whence it parallels the Bay Side extension to a point immediately northwest of the premises of plaintiff, where the new line intersects the Bay Side extension. This line is known as the respondent's Point Defiance line, and it proposes to use the right of way through the premises of plaintiff as a part of its Point Defiance line to reach its station in the city of Tacoma, and likewise it proposes to use the Point Defiance line as its main line from Tacoma to Portland and to Southwestern Washington, and to operate thereon its freight and passenger trains, with the exception of some local trains, between the same points of intersection on the old line, and to permit the operation over the new line of freight and passenger trains of the Oregon-Washington Railroad & Navigation Company, and possibly in the future the Great Northern Railway Company.

The evidence discloses that the right of way through plaintiff's premises is twenty feet wide, and is built along the shore beneath the bluff on which plaintiff's mill is situated, and that the right of way is covered by a fireproof structure

or tunnel which at places is only seventeen feet high, and at no place exceeds nineteen feet in height. In this tunnel are four twelve and one-half degree curves. A switch track is constructed within this tunnel, beginning near the center and extending to the northwestern margin of appellant's premises, as provided in the contract, for appellant's use. A grade crossing through the tunnel is maintained near the northwestern end of appellant's premises, connecting its offices, wharves, and lumber yards with the city by way of Old Town; and another grade crossing through the tunnel near the southerly end of appellant's premises connecting with the streets extending toward Pacific avenue, in Tacoma. These crossings are used by appellant for the purpose of marketing its lumber and slabs in the local market, and the crossings are at right angles to the city thoroughfares with which they connect, and persons and teams approaching the crossings are unable to see approaching trains. When the mill is in operation, teams are required to use these crossings, going or coming, every five or six minutes during the day, and in hauling heavy loads, teams are likely to become stalled on account of the grade at the crossings. There is evidence also that, if respondent is permitted to use this track as proposed, there will be considerable noise and vibration in appellant's offices during the passage of heavy trains; that it will be difficult to market the lower grade of its lumber in the local market by reason of the difficulty of access to its plant; that it will, therefore, be difficult to compete with other mills in the prosecution of its lumber business. There is also evidence that it is believed the mill property will be subjected to a greatly increased fire hazard.

At the outset it is conceded by appellant that, if the intention of the parties may be clearly and certainly determined from the language they employ, recourse will not be had to extrinsic evidence for the purpose of ascertaining their intention. It is contended that an examination of the instrument discloses that it is not, as the trial court assumed, a

mere deed granting a right of way for railroad purposes, a unilateral contract, but a mutual agreement formally executed by both parties; that the intention of the parties is not, therefore, to be determined solely by consideration of the words of grant, and in the construction of such a contract, courts must be governed by certain fundamental rules of construction.

It is, as contended by appellant, undeniably true that a fundamental rule of construction is that a written contract shall be read as a whole; that all its provisions are to be considered, and that the general design must not be frustrated by allowing too much force to single words and clauses.

"The elementary canon of interpretation is, not that particular words may be isolatedly considered, but that the whole contract must be brought into view and interpreted with reference to the nature of the obligations between the parties, and the intention which they have manifested in forming them." *O'Brien v. Miller*, 168 U. S. 287.

On the other hand,

"The controlling canon for the interpretation of deeds, if unambiguous, is to ascertain the intention of the grantor from the words employed." *Bernero v. McFarland Real Estate Co.*, 134 Mo. App. 290, 114 S. W. 531.

The written instrument of January 24, 1906, is both a deed of conveyance of the right of way described therein and a contract containing conditions to be performed by the parties thereto. This contract reached back and incorporated and interpreted the original agreement and deed between appellant and respondent's predecessor of May, 1888. The present contract provides for the execution of certain conditions to be performed by the parties, viz., (1) for the respondent to make and deliver a lease of certain water lots owned by it to the appellant; (2) for the appellant to grant the right of way through its mill property as expressed in the agreement "for what is known as the Bay Side extension of said company's railroad along the water front of Com-

mencement Bay." These provisions were performed and, by the eighth paragraph of the agreement, the agreement and the right of way deed are to be "considered and taken as one transaction." The grant of the right of way is as follows: "Now, therefore, the said Tacoma Mill Company . . . does hereby grant to the said Northern Pacific Railway Company . . . the right of way for railway or other similar purposes," etc.

But appellant insists that the description by metes and bounds, following this paragraph, does not measure the grant, but simply defines the area of land over which the easement granted is to be exercised; that if the granting clause read "does hereby grant the [said] right of way for railroad or other similar purposes," it would not be contended that the right of way grant was other than for the Bay Side extension.

Viewing the contract as a whole, it itself discloses that a large manufacturing plant belonging to appellant then existed, and was to be maintained upon the same premises, and that appellant would be adequately compensated for the grant of the proposed right of way by the new facilities to be given; that this property was to be protected by covering the right of way with a fire-proof tunnel which should not exceed nineteen feet in clear above the rail; that all roadways leading to and from the premises should be restored by the railroad company and all changes in the buildings made at its expense; that additional facilities should be afforded for the storage of plaintiff's logs; that doors, openings, and gangways should be put in and maintained in the tunnel for the convenience of appellant's business; that a side track should be built in this tunnel for the sole use and benefit of appellant in shipping and receiving lumber or goods; that the railroad company should do all switching of cars for appellant in its business free of charge, and that such switching should be done promptly as the business of appellant should

require; that the right of way should be but twenty feet in width.

It is insisted that the proposed use of the right of way by respondent will greatly diminish or wholly destroy some of the privileges thus reserved to the appellant by the terms of the agreement; that if, in addition to the uses of the original track as a freight or industrial track, it may lawfully use the same for the number of trains now proposed to operate over its line, then it may hereafter lawfully make such increased use as the exigencies of the future shall demand, and that it is certainly probable that the future demands upon its main line adjusted at this point to one track will require the practically continuous use thereof.

But the same thing may be said if it were construed to be the original intention of the parties that nothing but freight cars or switch engines should be moved over the original Bay Side extension, as it was called. It is evident that the Bay Side extension was not a mere side track or industrial spur, but was a sort of branch railroad, extending from the terminus of respondent's predecessor, and as long thereafter used by respondent in the city of Tacoma, to a smelter in the city of Tacoma near Point Defiance. There were a number of industries situated along that track to which side tracks or spurs were constructed and maintained for the purpose of handling freight. It is very obvious that the growth of a very large city might have compelled the location of a vast number of industries along this water front and along this Bay Side extension, to move the freight to and from which would require almost or entirely the continuous use of the track; that freight cars and engines might have to move upon it very frequently. Such being the case, it seems plain that the parties originally contemplated that such might be done.

There is nothing in the original or the present contract between the parties whereby the respondent or its predecessor was bound not to extend the Bay Side extension to any other

point should it find it necessary, and there is nothing in either
of the instruments prohibiting respondent or its predecessor
from running any more than a certain number or kind of
trains upon that track. The fact that the railroad track is
designated and described in the agreement as the Bay Side
extension does not operate to limit the nature of the use of
the railroad in any way. The track was at that time known
and designated as the Bay Side extension. It appears that
there was a plan on foot, at the time the original negotia-
tions were entered into between appellant and the railroad
company, on the part of one Allen C. Mason, to construct an
independent railroad to be called the Washington Short Line
Railroad, from the terminus of the Bay Side extension, at or
near appellant's property, to the then proposed site of the
Tacoma smelter. It was desired by the railroad company
to construct and operate such railroad itself, and steps were
taken to acquire all the rights of Mr. Mason for the pur-
pose of extending the Bay Side extension to the proposed
site of the Tacoma smelter. This shows to a slight extent,
at least, that the railroad was not considered merely a side
track or industrial spur, but was in a certain sense a rail-
road, and as such was contemplated and designed to be a
part of the railroad company's system and an extension
thereof, although it was not then contemplated to be a main
line railroad or any part thereof; the ultimate public and in-
dustrial demands and increased traffic, no matter to how large
extent, must have been contemplated by the parties as part
of the maintenance and operation of the road.

Appellant further urges, however, that it is our duty in
defining the relative rights of the parties to ascertain their
intent and, when found, to give effect to that intent; that the
language employed is to be construed in the light of the facts
and circumstances existing at the time of its execution and
the objects and purposes the parties had in view; citing a
number of authorities.

The same contention was made in the case of *Kanaskat Lumber & Shingle Co. v. Cascade Timber Co.*, 80 Wash. 561, 142 Pac. 15, wherein this court, per Chadwick, J., observed:

"The duty of courts, when construing questioned contracts, to search out the intention of the parties, is well established, but that duty arises out of an ambiguity or omission that demands the reception of testimony to illustrate their intent, or to harmonize apparent conflicts. There is a presumption of finality which attends all written contracts and courts will not deliberately raise doubts or conjure ambiguities for the mere pleasure of construing them. *Fairbanks Steam Shovel Co. v. Holt & Jeffery*, 79 Wash. 361, 140 Pac. 394. Nor will the fact that a party has made a hard or improvident bargain warrant the court in binding the other party to terms raised by construction or implication. These propositions are admitted as elementary by appellant; but it is said that the whole contract, when construed in the light of the facts and circumstances existing at the time the contract was made and the general object and purpose of the parties, demands a ruling that respondent was bound to keep appellant's mill in operation. . . . There is nothing, unless we go outside of the written contract, to bring the parties within the rule announced in *Excelsior Wrapper Co. v. Messinger*, 116 Wis. 549, 93 N. W. 459, where the court found the contract to be ambiguous and applied the rule as it relates to an established business having a certain demand for a certain amount of stock, which must have been known to the opposite party who was held to have contracted with reference thereto. . . . We have discussed this phase of the case enough to demonstrate that to receive testimony or to imply terms would but lead to confusion, whereas courts invite testimony to clear up ambiguous contracts and to make that certain which is uncertain. Although questioned by counsel, we think the case of *Hamlyn & Co. v. Wood & Co.*, 22 Q. B. Div. (1891) 488, is in point. We agree with the observation of Lord Esher, M. R., that authorities are of little use in cases of this character, for at best they merely show that, in a particular case, an implication was or was not made."

In *Hamlyn & Co. v. Wood & Co.*, 22 Q. B. Div. (1891) 488, cited by Chadwick, J., it was observed by the opinion writer that:

"When parties have put into writing the terms upon which they agree, more especially in the case of mercantile contracts, it is a dangerous thing lightly to imply what they have not expressed. Here it is clear that there is no breach of the contract as expressed upon the face of the written document."

"It is a well settled principle of law that all prior negotiations of the parties are merged into a contract in writing when one is entered into covering the subject-matter of such negotiations, and we are not aware of any rule which will authorize oral proof, as to representations made before the execution of such contract, to be introduced in evidence for the purpose of contradicting or enlarging the scope of such contract, without an allegation in the pleadings that such contract was in fact signed by the party making such allegations by mistake or fraud, or without full knowledge of the conditions thereof. As we have seen, such allegations were entirely wanting in the case at bar, and we think all representations or negotiations prior to the execution of said contract were, under the circumstances of this case, entirely immaterial, if the contract in question was unambiguous." *Staver & Walker v. Rogers*, 3 Wash. 603, 28 Pac. 906.

So in the case at bar. Appellant did not plead any mistake or fraud. There was no fiduciary relation between the parties. They dealt at arm's length. Each party was represented by extremely competent counsel. They proceeded with the utmost care and deliberation.

Without reviewing all the cases cited by appellant upon this phase of the case, it will be found that in nearly all of them appears some fact or circumstance tending to show fraud or mistake, aside from the mere reliance upon the representations of the other party to the contract as to its contents.

"A deed which is upon its face an absolute grant is not subject to have reservations or limitations engrafted thereon by parol or extrinsic evidence of intentions, understandings, or agreements contradictory to or at variance with its clear language." 17 Cyc. 620.

"In order to let in evidence of a collateral agreement between the parties, such agreement must be consistent with the terms of the writing; and the evidence must not tend to vary or contradict the terms of the written instrument or to defeat its operation." 17 Cyc. 714.

See, also, *Hubenthal v. Spokane & Inland Empire R. Co.*, 43 Wash. 677, 86 Pac. 955; *Hathaway v. Yakima Water, L. & P. Co.*, 14 Wash. 469, 44 Pac. 896, 53 Am. St. 874; *Smith Sand & Gravel Co. v. Corbin*, 81 Wash. 494, 142 Pac. 1163.

The conveyance in question conveys by absolute grant the right of way for railroad and other similar purposes to the respondent. There are no reservations or limitations engrafted upon it, limiting or qualifying the grant for railroad and other similar purposes. Had appellant desired to limit its use as a right of way by providing that it should be used only for freight purposes, or only as an industrial spur, or that only a certain number of trains, engines, or cars should be moved thereon during the day or during certain hours, or that, in case of being used for additional purposes, other than the uses and purposes immediately contemplated, appellant should be compensated by the payment of further damages than the consideration expressed in the contract, all those things could easily have been included in the contract, and not having been included, it is reasonable to infer that they were not intended to be required.

The legal effect of the grant to the railroad company of a right of way to be used for railroad and other similar purposes is that the land thus taken and paid for for public use may be used for a public use by those corporations which act as agents and trustees for the public, that such corporations have a right to make all the use of the land which the necessities and convenience of the public may require, and that the land owner receives in damages a compensation which in theory of law is all the indemnity for all such uses. *Brainard v. Clapp*, 10 Cush. (Mass.) 6, 57 Am. Dec. 74; *Western Union Tel. Co. v. Polhemus*, 178 Fed. 904, 29 L. R. A. (N. S.) 465.

The purpose of the taking must fix the right. *Newton v. Perry*, 163 Mass. 319, 39 N. E. 1032.

In an action to recover damages claimed to result from the increased use of the defendant's railroad, it was held that the grant of a right of way to a railroad company "for all uses and purposes or in any way connected with the construction, preservation, occupation and enjoyment of said railroad," is broad enough to embrace all uses for railroad purposes, however much increased; and that it will be conclusively presumed that all damages to the land outside of the right of way, past, present, and future, were included in the consideration paid for such grant. *Chicago, R. I. & P. R. Co. v. Smith*, 111 Ill. 363. This case was reaffirmed by the supreme court of Illinois in *Kotz v. Illinois Cent. R. Co.*, 188 Ill. 578, 59 N. E. 240.

Certain property owners executed a deed to a railroad company, granting the right of way for a branch road across their property. The supreme court of Minnesota in that case (*Liedel v. Northern Pac. R. Co.*, 89 Minn. 284, 94 N. W. 877), held that the road constructed pursuant to the contract was not a private line for the benefit of the property owners only, but was a public line, a part of the company's railroad system, and subject to general state laws governing railroads. In that case it was said:

"Considering the contract in all its bearings, we are satisfied that it is not susceptible of the interpretation put upon it by respondent. The grant is absolute of a strip of land through the property described to be used for a right of way for the railroad track. In consideration of this grant the railroad company agreed to construct a track over the right of way and to transfer or switch cars from it and its main railroad to and from any private tracks connecting therewith at no greater than the usual charges for such services. The effect of these provisions was to make this branch road a part of the main system, and, in connection therewith, to subject it to the regulations of the State Railroad and Warehouse Commission. This branch is in no sense a private track, but is a complete and efficient part of appellant's railway system. It

may be used for the benefit of the public as well as the private property referred to, and the company may establish a station or freighthouses and condemn property for its uses in connection therewith to the same extent that it may for the benefit of any other part of the road. This inference is not modified by the language pointed out by respondent, viz., that the track is for the accommodation and use of the parties to the deed. That clause neither adds to nor takes away from the effect of the contract. If it be stricken out, it would follow that the track became a part of the main system, and for that reason must be operated for the accommodation of the company; but it must be operated for the benefit of the grantors also, without regard to that clause, for the reason that it is required to be connected with their private side tracks, and that cars be delivered at reasonable rates. Neither does the other provision add to or take away anything from the effect of the contract, viz., that the rights of the company shall cease and determine at any time when the strip of land ceases to be occupied for such railroad track. In the absence of such an agreement, it does not follow that the railway company, of its own volition, might arbitrarily abandon the track, and leave the grantors without railroad facilities. In this respect the community is also under the dominion of the laws of the state."

In *Abraham v. Oregon & C. R. Co.*, 37 Ore. 495, 60 Pac. 899, 82 Am. St. 779, 64 L. R. A. 391, Bean, J., writing the opinion, said:

"We come, then, directly to a consideration of the question as to whether parol evidence is admissible to show that the words 'legitimate railroad purposes' were used in the deed in a particular sense. It is an elementary rule of law that parol evidence cannot be admitted to contradict or vary a written instrument; and it is equally well settled that parol evidence may not be given to show that common words, the meaning of which is plain, and which do not appear from the context to have been used in a peculiar sense, were in fact so used. . . . 1 Greenleaf, Evidence (15 ed.) § 295. And Lord Chief Justice Tindall says: 'The general rule I take to be that where the words of any written instrument are free from ambiguity in themselves, and where external circumstances do not create any doubt or difficulty as to the proper

application of those words to claimants under the instrument, or the subject-matter to which the instrument relates, such instrument is always to be construed according to the strict, plain, common meaning of the words themselves, and that in such case evidence *dehors* the instrument, for the purpose of explaining it according to the surmised or alleged intention of the parties to the instrument, is utterly inadmissible. If it were otherwise, no lawyer would be safe in advising upon the construction of a written instrument, nor any party in taking under it; for the ablest advice might be controlled, and the clearest title undermined, if at some future period parol evidence of the particular meaning which the parties affixed to his words, or of his secret intention in making the instrument, or of the objects he meant to take benefit under it, might be set up to contradict or vary the plain language of the instrument itself.' . . . 'Ambiguous words or phrases may be reasonably construed to effect the intention of the parties, but the province of construction, except when technical terms are employed, can never extend beyond the language employed, the subject-matter, and the surrounding circumstances.' It is, therefore, not competent for either of the parties to a contract, where its language is plain and unambiguous, to prove by parol evidence how it was understood, or the meaning of the words used. . . . Applying this rule to the case in hand, it is clear that the plaintiff cannot show by parol testimony that the deed from himself and Willis to the railroad company was not intended to, and did not, convey to such company the right to use the property for all legitimate railroad purposes."

In *St. Louis & B. Elec. R. Co. v. Van Hoorebeke*, 191 Ill. 633, 61 N. E. 326, the court said:

"If the appellees desired to reserve the right to build crossings across the right of way, and across the roadbed of the appellant, they should have embodied such a provision in the contract. . . .

"Where a railroad company obtains a right of way by purchase from the land owner, having power under the constitution and law to do so, all the incidents attach to such right as are acquired by eminent domain when the right of way is obtained by condemnation, it being conceded or established that such company can lawfully exercise the power of emi-

nent domain. In other words, a railroad company acquires the same rights and privileges under a private grant as to the construction and operation of its road, as under a right of way acquired by condemnation, where it has the power, under the law, to receive by grant and to acquire by condemnation. Had this right of way been lawfully acquired by condemnation appellees would have received compensation for the value of the strip of land, and also an assessment of all damages to the residue of their tract to result from the construction and operation of the road. 'The rule is, that the appraisement of damages in a case of condemnation embraces all past, present and future damages, which the improvement may thereafter reasonably produce.' . . . Here, the strip of land is, by the terms of the contract, to be conveyed for the purpose of a railroad right of way, and for the purpose of constructing and operating thereon a double track electric railway."

It is not contended by appellant in this case that the proposed additional use by respondent of the right of way in question is not a legitimate railroad purpose. We can see nothing ambiguous in the contract that subjects it to extrinsic construction. We are impelled to the conclusion that the judgment of the lower court was right.

Affirmed.

FULLERTON, ELLIS, MOUNT, MAIN, and PARKER, JJ., concur.

MORRIS, C. J. (dissenting)—I cannot concur in the majority opinion. Time and pressing engagements prevent my writing a formal dissent. I wish, however, to express in a casual way the reasons for my views.

The majority opinion is based upon the fundamental error that the contract of January, 1906, is an unlimited grant of a right of way for general railroad purposes. The first rule of interpretation as applied to grants is that the contract must be viewed with reference to its subject-matter, its obligations, and the manifest purpose and intention of the parties. The majority opinion concedes this rule, then departs from

it, holding that the granting words in the so-called deed of January, 1906, are broad enough to entitle the railway company to use the right of way for general main line purposes; ignoring in so holding, not only the basic rule of interpretation, but the manifest intention of the parties as expressed .in the instrument itself. It is as clear as language can make it, when the agreements of January, 1906, and May, 1888, are read together as they should be, that the parties were dealing with only one contemplated use—a right of way for the so-called Bay Side extension. All parties knew and contracted with knowledge of the fact that this extension was a freight service track for the accommodation of industries along the water front. Now, after so using this right of way all these years (a use confirming the limited character of the granted right as contemplated by the parties), the railway company constructs a new main line intersecting this extension right of way at the northwest boundary of appellant's property, and has since such construction used this right of way, not only for the purposes of its Bay Side extension, but also for trackage for the freight and passenger service of the Northern Pacific Railway Company, the Oregon-Washington Railroad & Navigation Company, and the Great Northern Railway Company in connection with the new main line to the south, known as the Point Defiance line. It is frankly conceded by the railway company that such a use was never dreamed of at the time the right of way was granted, and it is now permitted because it is said that the so-called deed of January, 1906, is an absolute grant of a right of way for railroad purposes, and parol evidence is not admissible to vary or contradict its terms.

I deny, first, that the agreements of January, 1906, and May, 1888, show an absolute grant for railroad purposes, and second, that there is an attempt here to vary or contradict the terms of a written agreement. To contradict a written agreement is one thing. To admit evidence to enable the

court to ascertain the real intention and agreement of the parties and enforce it accordingly is another thing. The first may not be done; the second may, either by reforming the instrument itself or by treating it as reformed.

These are, in the main, the reasons why I cannot concur. More time might enable me to make them plainer. I have, however, said enough to indicate the ground of my dissent, without attempting to show the extent to which the facts and law sustain my views.

CHADWICK, J., concurs with MORRIS, C. J.