# Montgomery B. & T. Co. *v.* Walker.

*Bill to Collect and Preserve Assets of Insolvent Bank.*

(Decided April 15, 1913. Rehearing denied May 8, 1913. 61 South. 951.)

1. *Constitutional Law; Due Process; Banks and Banking.*—The fourteenth amendment to the Federal Constitution does not deprive the state of the power to determine by what process legal rights may be asserted or legal obligations enforced; hence, the provisions of Acts 1911, p. 59, sec. 10, do not work a deprivation of property without due process of law.

2. *Banks and Banking; Insolvency; Rights of Bank Superintendent.*—Under the provision of sec. 10, Acts 1911, p. 59, the superintendent is in reality a receiver, and there is no change in the ownership or legal title of the property.

3. *Same; Power of Superintendent.*—Under the provisions of section 10, Acts 1911, p. 59, the superintendent has power to sue in the name of the bank to avoid a fraudulent transaction made by the bank officials.

4. *Same; Trust Fund.*—Regardless of the provision of section 3509, Code 1907, the assets of an insolvent bank must be regarded as a trust fund for the payment of creditors, and the stockholders, directors and agents of the bank are trustees for their benefit, and as such may be made to discover and account in chancery.

5. *Same; Action by Superintendent; Remedy at Law.*—Where the superintendent of banks desires to avoid a transaction whereby the officers of an insolvent institution pledged collateral to another bank for an antecedent debt, as well as one presently created, and challenged the authority of the officers, but offered to do equity, he had

[Montgomery B. & T. Co. v. Walker.]

no plain and adequate remedy at law, and the jurisdiction of equity was properly invoked.

6. *Same.*—Where the superintendent of banks filed a bill to set aside a pledge of the assets of an insolvent bank made by its president, and averred that the president had no such authority, it was not necessary that the bill should negative special authority, as that was a matter of affirmative defense.

7. *Same; Power of President.*—The rule that presidents of corporations have no ex-officio power to sell or mortgage the property of the corporation, applies to bank presidents, and such officials have no right to pledge the assets of the bank, particularly to secure an antecedent and questionable debt.

8. *Same; Power of Cashier.*—While the cashier of a bank is its chief executive officer, and his authority exceeds that of the president and while he may sell the banks negotiable security in the regular course of business, his power is not unlimited, and he cannot pledge the assets of the bank for the payment of an antecedent debt.

APPEAL from Geneva Chancery Court.

Heard before Hon. L. D. GARDNER.

Bill by A. E. Walker, as Superintendent of Banks, against the Montgomery Bank & Trust Company to collect and preserve the assets of the Bank of Geneva, of which he had taken charge by virtue of his office. From a decree overruling demurrers to the bill, respondent appeals. Affirmed.

The bill alleges, among other things, that the Bank of Geneva was, prior to June, 1912, engaged in the banking business at Geneva, Ala., and was organized and incorporated under the laws of this state; that it did a general banking business, and had a capital stock of $50,000; that J. R. Clark was elected president of said bank, and he assumed the duties thereof and acted as such continually until June 3, 1912; and that a board of directors, consisting of five persons, whose names are set out, were elected to and did serve as directors of said bank.

In the fourth paragraph it is alleged that within two or three years after its organization the bank became insolvent, and that such condition remained and grew

[Montgomery B. & T. Co. v. Walker.]

worse, and further alleges that the bank is now insolvent.

In the fifth paragraph it is alleged that during the active existence of the bank it became connected in a business way with the Montgomery Bank & Trust Company, the respondent below, and that at times the Montgomery Bank & Trust Company made loans to the Bank of Geneva and extended it credit. In the same paragraph it is alleged that J. Lee Holloway was a stockholder and director in both banks, and was related to J. R. Clark, president of the Bank of Geneva; that said Holloway and other officers and directors of the Montgomery Bank & Trust Company had opportunity to know, and did know, the financial condition of the Bank of Geneva at the times set out later in the bill; that Clark had confidence in the Montgomery Bank & Trust Company and in T. E. Lovejoy, its president; and that the relations between the two banks were cordial and friendly until a short time prior to June 3, 1912.

In the sixth paragraph it is alleged that the Montgomery Bank & Trust Company claimed that the Bank of Geneva was indebted to it in the sum of $25,753.24, maturing and coming due some four or five years prior to this date; that in fact the greater portion of the amount arose prior to the organization of the Bank of Geneva, being due and owing by the First National Bank of Geneva, and alleges that he does not know the nature of the claim, but he does allege that it was not in the form of a bill receivable; and that the Montgomery Bank & Trust Company held no written obligation of the Bank of Geneva to pay the same until the spring of the year 1912, and shortly prior to June 3, 1912. He alleges also in the paragraph that the Bank of Geneva did not owe the alleged claim or demand, and was in no wise connected with it, and that the Bank of Geneva

never entered the same upon its books as a liability or bills payable, and that the Bank of Geneva denied and disputed said alleged claim or demand, which fact was known to the Montgomery Bank & Trust Company prior to June 3, 1912.

In the seventh paragraph he alleges that T. E. Lovejoy, president of the Montgomery Bank & Trust Company, knew that the Bank of Geneva was hopelessly insolvent, and with that knowledge on his part, and through him on the part of the Montgomery Bank & Trust Company, and with the purpose and intent and the ultimate design of securing the alleged indebtedness of $25,753.24, caused many wrongs to be committed against the Bank of Geneva and its creditors, and obtained physical possession, in the way of collateral security, of much of its assets to which it was not and is not entitled; that during the winter or spring of 1912, the Bank of Geneva being in desperate straits and being almost forced to cease business on account of insufficient funds, a fact which the bill alleges was known by the Montgomery Bank & Trust Company, for speedy and immediate relief in the way of borrowing from it a certain sum of money, the Montgomery Bank & Trust Company, being afraid to loan the Bank of Geneva money, required the Bank of Geneva to put up collateral to secure a loan of from $5,000 to $7,000. And in the same paragraph the bill alleges that the Montgomery Bank & Trust Company, in acquiring and taking over the collaterial for said loan and to secure the same, and with the purpose and intent on their part to secure its alleged claim against the Bank of Geneva, and for the purpose of securing a preference for said alleged indebtedness, and in fraud of the rights of the creditors of the Bank of Geneva, required Clark, president of the Bank of Geneva, to assign, pledge, and turn over to said

Montgomery Bank & Trust Company a large amount of securities owned and held by the Bank of Geneva, to wit, $60,000, and of the value of $32,000; in accordance with such requirement the said Clark turned over and delivered to Montgomery Bank & Trust Company said collateral.

In the eighth paragraph the bill alleges that the Bank of Geneva was cited to appear before the State Banking Board at Montgomery on, to wit, June 3, 1912, to show cause why said Bank of Geneva should not cease as a going concern and its business and affairs be wound up and liquidated by said board; that on that day no cause being shown, and, in fact, consent being given, the affairs and business of said Bank of Geneva were taken over by said Banking Board and process of liquidation commenced by A. E. Walker, as Superintendent of Banks; that the property, assets, and affairs of the Bank of Geneva are held by A. E. Walker, as Superintendent of Banks, for the purpose of liquidation and the collection of its debts and payment of its liabilities; and he alleges that the assets are not sufficient to pay the liabilities, setting out the amounts; and in the same paragraph charges that Lovejoy, and probably others connected with the Montgomery Bank & Trust Company, knew that the Bank of Geneva had been cited to appear before the said Banking Board and knew, or honestly believed, that said Bank of Geneva would cease business and its affairs would be wound up through the Banking Board; that in anticipation of such course, and in furtherance of the design, intent, and scheme of the Montgomery Bank & Trust Company to collect the alleged debt and to appropriate for that purpose a substantial portion of the assets of the Bank of Geneva, and in fraud of the rights of the creditors, the Montgomery Bank & Trust Company on, to wit, June 2, 1912,.

[Montgomery B. & T. Co. v. Walker.]

sold, or pretended to sell, collateral held by it, or substantially all of it, and claims to have purchased it at and for the sum of $1,500, leaving thereby a large balance due on said alleged debt. And it is further averred and charged that the Banking Board, or the Superintendent of Banks, had no knowledge of the alleged sale until two or three weeks thereafter, and that, if notice was given, it was done by insertion in some newspaper of small circulation; and it further alleges that the Montgomery Bank & Trust Company is now holding the collateral and asserting rights to all of it and refuses to surrender it to the Superintendent of Banks.

In the tenth paragraph the bill charges that the pledge of said collateral to the Montgomery Bank & Trust Company was and is absolutely void for that J. R. Clark, as president of the Bank of Geneva, had no authority, as president or otherwise, to pledge or dispose of the assets of the Bank of Geneva in that manner.

In the eleventh paragraph he says that, if he is mistaken in that, then he charges that the contract or agreement whereby the Montgomery Bank & Trust Company acquired said collateral was and is wholly void for that the Bank of Geneva had no authority or right to pledge said property without authority of its board of directors, and no such authority was given as required by law.

In the twelfth paragraph he says that, if he is further mistaken, he then charges that the pledge of said collateral was and is wholly void for that the same was acquired by the Montgomery Bank & Trust Company with the intent to have itself preferred and with intent to hinder, delay, and defraud creditors of the Bank of Geneva from their lawful and just demands and claims.

In the thirteenth paragraph he says that, if he is mistaken in all that he has heretofore alleged, then he alleges that the transfer and pledge of said collateral to the extent of the excess of the amount claimed by Montgomery Bank & Trust Company over and above the $7,000 borrowed and admitted is void as to any other and further amount for that said Bank of Geneva did not owe the Montgomery Bank & Trust Company said amount of $25,753.24, or any portion thereof, as claimed and alleged by the Montgomery Bank & Trust Company, and that therefore the pledge of collateral to secure said fictitious claim was and is void. And also in the same paragraph the bill says that, if mistaken as to the existence of the debt, then he says that Clark had no authority, and the Bank of Geneva had no authority, to pledge its property and assets to secure a past-due debt and give such creditor preference over other creditors; the said Bank of Geneva at the time being insolvent, and this fact being known to the Montgomery Bank & Trust Company.

In the fourteenth paragraph of the bill he alleges that, if mistaken in all the other allegations and charges, he says that if the Montgomery Bank & Trust Company is rightfully and legally entitled to hold said collateral, or any portion of same, for and on account of any valid debt due the Montgomery Bank & Trust Company by the Bank of Geneva, the complainant is willing and offers to redeem such collateral by paying such amount as may be required by this court, and for that purpose submits itself to the jurisdiction of the court.

To this bill the respondent filed demurrers raising the following questions: 1. That there was no equity in the bill for the reason that A. E. Walker, as Superintendent of Banks, had no authority under the laws of

the state of Alabama to file or maintain the bill in this case; that he did not have title to the property; that he was not authorized to bring the suit; that the provision in the banking act authorizing him to take possession of the property of banks was in violation of the Consti tution of the state of Alabama and of the United States; that the complainant had a clear and adequate remedy at law; that the president of the institution being a banking institution, had a right to pledge the property of the bank as collateral for its debts with power to bind the bank; that the allegations with reference to the preference of creditors was entirely inadequate; that the bill showed, that at the time of the sale of the collateral and the purchase by the Montgomery Bank & Trust Company, there was an amount due by the Bank of Geneva to the Montgomery Bank & Trust Company which was unpaid; that pledged collateral after sale cannot be redeemed, and other points.

BALL & SAMFORD, for appellant. It takes the judg-ment of a court of competent jurisdiction to be due pro-cess of law.—8 Cyc. 1080-1085. Hence, if the act gave the Superintendent of Banks title to the property in such sort as would authorize him to maintain this suit, it is violative both of the Constitution of the United States, and of the state of Alabama, as denying due pro-cess of law. The Superintendent of Banks has no au-thority under law to file or maintain the bill in this case. —16 Cyc. 159-B, 190 (2) ; 15 Enc. P. & P. 590-4; *Park-man v. Aircardi*, 34 Ala. 399; 30 Cyc. 94. At most the superintendent of banks is a mere agent under the stat-ute and agents are not proper parties to a suit in chan-cery.—16 Cyc. 197; 15 Enc. P. & P. 598. The corpora-tion, and not its officers must sue to redress wrongs of the corporation.—22 N. J. E. 63; 28 W. Va. 750. A

real party in interest is not the superintendent of banks in this instance.—30 Cyc. 44, 83. Even if authorized to maintain this suit, he had a plain and adequate remedy at law. The president of a bank is such a general executive officer as may within the scope of his apparent authority bind the bank by a transfer of its assets to secure its obligations.—5 Cyc. 469; *First Nat. Bank v. First Nat. Bank*, 116 Ala. 521; *Wynn v. Tallapoosa Bank*, 168 Ala. 469. It is within the apparent authority of a cashier of a bank to borrow money and pledge collaterals.—11 L. R. A. (N. S.) 598; 24 L. R. A. 264; 19 L. Ed. 1008; 5 Cyc. 457; *Ala. Nat. Bank v. O'Neal*, 128 Ala. 196. The fact that one of the directors of the Bank of Geneva was also a director of the Montgomery Bank & Trust Company was not notice to the latter of any limitations or other facts known to the former.— *Scott v. Choctaw Bank*, 59 South. 184. It is a matter of common knowledge that the affairs of the bank are left largely to the management of the president and cashier, and hence, their transactions will be held good. —24 L. R. A. 264. The bank had a general lien on all collaterals in its possession to secure its indebtedness. —*Wynn v. Tallapoosa Bank, supra;* 31 Cyc. 831.

W. O. MULKEY, for appellee. The banking law in some of its features is modeled largely after the National Banking laws, and in this case, section 10, of the Acts of 1911, p. 59, is similar to section 5234, of the National Banking Act, and gave the superintendent authority as a receiver with power to maintain such suits as these, or other suits to collect and reduce the assets of the insolvent state bank.—8 Ben. 357; 14 Wall. 383; 17 Wall. 19; 34 Cyc. 186; *Banks v. Spears*, 103 Ala. 436; *Calhoun v. Fletcher*, 63 Ala. 574; *Oates v. Smith*, 57 South. 440; *Howarth v. Lombard*, 175 Mass. 570.

[Montgomery B. & T. Co. v. Walker.]

The remedy at law was inadequate, 'and the bill was properly filed in the chancery court.—Sec. 3509, Code 1907; 16 Cyc. 1264. The property of the corporation cannot be pledged, mortgaged or disposed of without affirmative action on the part of the board of directors, and neither the president nor the cashier of the bank can do so without authority from the board.—Subd. 3, sec. 3481, Code 1907; *Buchald T. Co. v. Hurst,* 19 A. & E. Ann. cases, 619; 115 Ala. 322; 50 Am. Dec. 394; 23 Id. 728; 56 Id. 116; 25 Am. Rep. 506; 78 Am. St. Rep. 560; 79 Mo. App. 352. There is no doubt about the constitutionality of the act, and it is not to be criticized as withholding due process of law.—145 Ala. 662; 151 Ala. 469; 152 U. S. 377; 181 U. S. 183; 139 U. S. 462; 182 U. S. 427; 48 L. R. A. 679; 28 L. R. A. 769; 8 Cyc. 1095.

ANDERSON, J.—"While forms of procedure and practice may be altered, due process requires that the substance of property rights be preserved, and that an opportunity remain to invoke the equal protection of the law by some judicial proceeding adequate and appropriate. The fourteenth amendment does not undertake to control the power of a state to determine by what process legal rights may be asserted or legal obligations be enforced, provided the method of procedure adopted for these purposes gives reasonable notice and affords fair opportunity to be heard before the issues are decided."—8 Cyc. 1095. The essential elements of due process of law are notice and opportunity to defend, and, in determining whether such rights are denied, the courts are governed by the substance of things and not by mere form.—*Simon v. Craft,* 182 U. S. 427, 21 Sup. Ct. 836, 45 L. Ed. 1165; *L. & N. R. R. Co. v. Schmidt,* 177 U. S. 230, 20 Sup. Ct. 620, 44 L. Ed. 747. Section

10 of the Act of 1911, p. 50, which said act created the banking department of the state, requires that, before the banking board shall declare a bank in default or turn its affairs over to the Superintendent of Banks, the superintendent must first submit to the board the matters of default or misconduct in the affairs of the bank, of which the bank shall have notice and upon which it may be heard in person or by counsel. This section also authorizes the bank, if it feels aggrieved by the action of the board to apply, within ten days, to the chancery or circuit court for an injunction, and authorizes a reinstatement in case the application is meritorious. We think that the act meets the due process requirement of the federal Constitution.

Moreover, we do not understand the act as making this proceeding operate as a change in the ownership or legal title to the property, but the superintendent is in reality a receiver who takes charge of the bank for the benefit of the stockholders, depositors, and other creditors.

We also think that the superintendent has the authority, under the terms of the act, to maintain this bill or to bring suit for the recovery of the assets of the bank. The act not only authorizes the superintendent to collect all debts due and claims belonging to the bank, but "to do such acts as are necessary to conserve its assets and business." The state banking law, and under which this bill is filed, in some of its features is modeled largely after the National Banking Laws. Section 5234 of said National Bank Act (U. S. Comp. St. 1901, p. 3507) reads as follows: "Appointment of Receivers. On becoming satisfied, as specified in sections fifty-two hundred and twenty-six and fifty-two hundred and twenty-seven, that any association has refused to pay its circulating notes as therein mentioned, and is

in default, the Comptroller of the Currency may forthwith appoint a receiver, and require of him such bond and security as he deems proper. Such receiver, under the direction of the Comptroller, shall take possession of the books, records, and assets of every description of such association, collect all debts, dues, and claims belonging to it, and, upon the order of a court  *  *  * sell all real and personal property," etc. We find no other authority in the act looking to the end of collecting the assets of the insolvent banks. The question as to the authority of the receiver to maintain suits and prosecute causes arising with respect to winding up the affairs of the bank has been repeatedly settled by the decisions of the Supreme Court of the United States. "It being a part of the affirmed duty of the receiver to collect the assets of the bank, he. may, as statutory assignee, sue therefor in his own name as in the name of the bank."—*National Bank v. Kennedy,* 17 Wall. (U. S.) 19, 21 L. Ed. 554; *Bethel Bank v. Pahquioque Bank,* 14 Wall. (U. S.) 383, 20 L. Ed. 840; *Stanton v. Wilkeson,* 8 Ben. (U. S.) 357, Fed. Cas. No. 13,299.

Section 3509 of the Code of 1907 says: "The assets of any insolvent corporations constitute a trust fund for the payment of the creditors of such corporations, which may be marshaled and administered in courts of equity in this state " Independent, however, of this statute, and whether it does or does not cover this identical cause, this court, in speaking of insolvent banks, in the case of *Bank of St. Mary's v. St. John et al.,* 25 Ala. 612, through Ligon, J., said: "The capital stock of the bank, with all of its property and assets, is to be regarded as a trust fund for the payment of creditors; and the stockholders, directors, and agents of the bank are trustees for their benefit, and as such may be made to discover and account in chancery. So, also, if any

one interfere with the trust fund without authority, and squander or misappropriate it, he will be held to be a trustee and made to account as such.—7 Beav. 175."—*City Bank & Trust Co. v. Leonard,* 168 Ala. 404, 53 South. 71.

The bill charges that Clark, the president, after the Bank of Geneva became insolvent, and which fact was known to the respondent, fraudulently and collusively with said respondent surrendered a large amount of collaterals of said insolvent bank, not only to secure the debt of $7,000 presently contracted, but in order that said respondent could use and handle said collaterals for the additional purpose of paying itself in full or partially a debt owing by the First National Bank of Geneva, and which was not owing by the present Bank of Geneva. The bill questions the authority of the president, Clark, to assign the collaterals at all, but offers to do equity, in case the respondent has a right to the collaterals to the extent of securing the loan actually made, and to pay said indebtedness upon the surrender of the collaterals, and it is difficult to conceive of adequate and complete relief by an action at law.

The president of a corporation, by virtue of his office; has no implied power to sell or mortgage property of the corporation.—*Drennen v. Jasper Investment Co.,* 153 Ala. 322, 45 South. 157. See, also, note to *Buchwald Transfer Co. v. Hurst,* 19 Ann. Cas. 623. This rule applies to presidents of banks as well as presidents of other corporations, and who have no authority other than what is expressly granted by the charter, by-laws, etc.—*Gibson v. Goldthwaite,* 7 Ala. 283, 42 Am. Dec. 592; *Spyker v. Spencer,* 8 Ala. 333. "He has no more power of management or disposal over the property of the corporation than any other single member of the

board. These remarks, of course, refer to his inherent powers enjoyed virtute officii, for, of course, if any resolution or any established usage gives him the power, either at all times or under special circumstances, to draw against the corporate deposits, he may do so within the limits of the power. * * * When the general management of the affairs of the bank is left, as is customary, with the directors, the president has not power to mortgage, assign, or pledge any more than he has to dispose otherwise of any of its property of any description whatsoever, or for any purpose, however justifiable and proper in itself."—Morse on Banking, §§ 143, 144. It has been held, however, in many cases that, where the president has no inherent power, he binds the bank in many instances by usage or express authority. "The cases, though largely occupied in deciding that a president has no authority by virtue of his office, yet hold the bank bound by his action whenever the charter, or a vote of the directors, or usage of the bank, or long acquiescence by the bank in a course of action by the president, or any facts constituting a holding out of the president by the bank as having a right to act for it, lay a foundation for authority actual or inferred, and whenever the bank has ratified his action." The present bill expressly charges that the president of the Geneva bank had no authority to pledge the collaterals to the respondents, and this feature of the bill is challenged by demurrer upon the idea that the office of president necessarily carries with it the authority to do what Clark did, and that the bill should charge wherein Clark's authority was properly curbed or restricted. As heretofore observed, the office did not carry with it the inherent power to pledge the collateral in the manner charged in the bill, and if special authority was given Clark, or his action was ratified or acquiesced in

so as to make the bank legally responsible for same, this would be defensive matter which the bill did not have to anticipate by a negative averment.

The cases of *First National Bank of Birmingham v. First National Bank of Newport,* 116 Ala. 521, 22 South. 976, and *Wynn v. Tallapoosa Bank,* 168 Ala. 469, 53 South. 228, each deal with the acts of the cashier and not the president of the bank, and the books recognize a decided distinction between the inherent authority of these two officers. Moreover, the authority was upheld in each of said cases upon the idea that the dealing was with innocent people and by cashiers acting within the general scope of duty and in whose acts there were years of acquiescence and ratification. The bill here charges that the respondent was not only an innocent purchaser, but that the $25,000 claimed of the old Geneva bank was not owing by the present one, and that the second loan was made collusively with Clark and for the purpose of surrendering collaterals greatly in excess of said last loan, for the fraudulent purpose of using said collaterals to liquidate the old debt of the First National Bank of Geneva, and for which the present Bank of Geneva was not liable.

The case of *Citizens' Bank v. Waddy,* 126 Ky. 169, 103 S. W. 249, 11 L. R. A. (N. S.) 598 128 Am. St. Rep. 282, involved the authority of a cashier, and not a president, to borrow money and pledge the securities of the bank. Moreover, there was no governing board, and the cashier seems to have been in entire control for the stockholders who had no board of directors.

The cashier is the chief executive officer of the bank through whom the financial operations of the bank are conducted, and, while his authority is not unlimited, it exceeds that of the president.—Morse on Banking, § 152. The cashier has no inherent power, however, to

[Allen, et al. v. State, ex rel. Rowe, et al.]

pledge the assets of the bank for the payment of an antecedent debt. He may dispose of the bank's negotiable securities in the regular course of business, but he cannot pledge its assets for the payment of an antecedent debt.—Morse on Banking, § 169.

The chancery court did not err in overruling the respondent's demurrers to the bill of complaint, and the decree is accordingly affirmed.

Affirmed. All the Justices concur, except DOWDELL, C. J., not sitting.