[No. 15298. *En Banc.* January 27, 1920.]

# LOUIS H. MOORE, *as State Bank Examiner, Appellant,* v. CLAUS F. BAASCH *et al., Respondents.*[1]

CONTRACTS (66)—CONSTRUING INSTRUMENTS TOGETHER. A tentative agreement for the amalgamation of two banks, and a reciprocal guarantee agreement on the part of the stockholders, made and entered into at the same time, must be considered together.

GUARANTY (9)—CONSTRUCTION—SCOPE OF CONTRACT—BENEFICIARIES. Where bank directors and stockholders agreed to the amalgamation of two banks, the stockholders at the time entering into a reciprocal guaranty of the paper held, the new organization was the direct beneficiary of the guaranty agreement, notwithstanding a resultant benefit to the stockholders; in view of provisions in the two contracts, considered together, whereby the paper guaranteed was to be taken over and collected by the new bank for its own benefit, and funds collected under the guaranty were to be paid to it.

PARTIES (3, 4)—BANKS AND BANKING (7)—ASSETS ON INSOLVENCY—REAL PARTY IN INTEREST—TRUSTEES—STATE BANK EXAMINER. A bank, being the direct beneficiary of a reciprocal guaranty of paper taken over at the time of its organization, and entitled to collect the paper, the state bank examiner, taking over the bank upon its insolvency, may maintain an action on the guaranty as the real party in interest, under Rem. Code, § 179.

FRAUDS, STATUTE OF (4) — ORIGINAL UNDERTAKING — ACTIONS — PARTIES PLAINTIFF. Where one promises, upon a valuable consideration, to pay the debt of another to a third person, the latter may maintain an action thereon in his own name.

GUARANTY (9)—BANKS AND BANKING (7)—ASSETS ON INSOLVENCY. Where a stockholders' reciprocal agreement guaranteeing the paper taken over by an amalgamated bank was accepted and acted upon, it cannot be rescinded by the stockholders without the consent of the bank.

Appeal from a judgment of the superior court for King county, Ronald, J., entered March 15, 1919, upon sustaining a demurrer to the complaint, dismissing an action on a guaranty agreement. Reversed.

[1] Reported in 187 Pac. 388.

*C. H. Winders (Joseph C. Sherman, of counsel), for appellant.*

*Flick & Paul, Hartman & Hartman, Burkheimer & Burkheimer, Donworth, Todd & Higgins, Emil J. Brandt, Wm. E. Froude,* and *F. W. Crary,* for respondents.

MAIN, J.—This is an action brought by the state bank examiner to recover upon a guaranty agreement. To his complaint the defendants in the action interposed a demurrer based on statutory grounds, which the trial court sustained. The bank examiner elected to stand on his complaint and refused to plead further, whereupon the court entered a judgment dismissing his action with prejudice. This is an appeal by the bank examiner from the judgment so entered.

The facts, as disclosed by the complaint, show that, in the year 1914, there were in the city of Seattle two banking institutions, the one, the Mercantile National Bank, operating under a Federal charter, and the other, the German-American Bank, operating under a charter derived from the state of Washington, each doing a general banking business. In the early part of the year named, certain of the officers and stockholders of the institutions conceived the idea of amalgamating the business of the institutions and agreed upon a tentative plan looking to that end. The plan, as reduced to writing, was as follows:

"The following proposition is submitted to the officers and trustees of The Mercantile National Bank and the German-American Bank, both of Seattle, the acceptance of both of said banks to be indorsed hereon in case of approval, such other and further instruments as may be necessary to carry the plan as herein outlined into full force and effect to be executed by both parties.

"(I)   The Mercantile National Bank is to turn over, as soon as it may be permitted to do so under the Federal laws relating to the liquidation of national banks, all of its accounts, notes, holdings, and business, including good-will. The German-American Bank is to file supplemental and amendatory articles of incorporation, increasing its capital stock $100,000, so as to make a capital stock of $200,000, and changing its name from German-American Bank to German-American Mercantile Bank.

"(II)   The German-American Bank of Seattle is to pass such resolution and obtain the execution of such instruments by its stockholders, or otherwise, as may be necessary to permit the additional $100,000 of stock to be subscribed, in form as shown by Exhibit 'A-1' attached, by such persons as may be named by the present board of trustees of The Mercantile National Bank, such stock to be subscribed within twenty days from the date of formal execution of this agreement, and to be paid in cash at par within fifteen days after such increase has been legally authorized, or in fifteen days after the stockholders of the German-American Bank of Seattle have ratified and assented to this contract in writing.

"(III)   The German-American Mercantile Bank, upon the increase of its capital stock in accordance with its by-laws, is to make provision so that its board of trustees shall consist of only nine members, and that its officers shall consist of a president, two vice-presidents, a cashier, and a chairman of its board of directors. Resignations of all of the present board of trustees of the German-American Bank shall be obtained, and such instruments are to be executed, or such arrangements made, as may be necessary to insure the election of a new board of trustees, as follows: Four trustees to be elected by the present stockholders of the German-American Bank, four trustees to be named by the stockholders of The Mercantile National Bank, and who subscribe to the increased $100,000 of stock, the ninth trustee to be chosen by the eight trustees so chosen. It is understood by the parties that the election of the board of trustees is a matter within

the hands of the present trustees or the stockholders, but that such arrangements will be made as will effectuate an election of trustees as provided for above, by-laws defining the duties and authority of the officers as provided for to be in substance as shown by form marked Exhibit 'B-2,' attached hereto.

"(IV) The German-American Mercantile Bank is to take over at par and accrued interest all of the bills receivable, obligations, and investments of The Mercantile National Bank which can be turned over to it under the statutes of the United States governing the liquidation of national banks, and is to take over at present book value its banking furniture and fixtures, subject to reduction, if any, made by order of state bank examiner, provided, however, that the stockholders of The Mercantile National Bank are to assume all lease accounts and all responsibility on account of the lease now held upon the banking house occupied by such bank.

"(V) The stockholders of The Mercantile National Bank who subscribe the additional $100,000 of stock in the German-American Mercantile Bank are to execute a good and sufficient guarantee to a trustee to be named by the stockholders of the German-American Bank so as to insure it against loss upon any of the obligations, investments, or property turned over to it by The Mercantile National Bank, if the same exceed the sum of $12,500, that is, the stockholders of the Mercantile National Bank who subscribe the additional $100,000 of stock of the German-American Mercantile Bank are to guarantee that there will be no loss upon any of the obligations, property, or investments of The Mercantile National Bank turned over to the German-American Mercantile Bank in excess of the sum of $12,500. The stockholders of German-American Bank of Seattle, in a manner so as to bind such stockholders, shall execute a good and sufficient guarantee to a trustee to be named by the stockholders of The Mercantile National Bank, or the individuals whom its board of trustees may name to subscribe the additional $100,000 of stock in the German-American Mercantile Bank, under which they shall guarantee said bank

against loss upon any of its paper or property in excess of the sum of $12,500; provided that, if there be a loss upon any obligations or property held by it in excess of $12,500, then there shall be credited on any such deficiency the amount of any surplus and net earnings as of date of the actual amalgamation of the two institutions, it being agreed that any balance remaining out of said surplus and net earnings not needed as just specified shall revert to the old stockholders of German-American Bank of Seattle. The agreement of guarantee is to be conditioned that the officers of the German-American Mercantile Bank may apply towards any deficiency arising hereunder pro rata any dividends which may subsequently arise upon the stock of the stockholders of said bank. The agreement of guarantee to be in substance as shown by form attached hereto and marked Exhibit 'C.'

"(VI) The German-American Bank is also to absorb or otherwise care for its leasehold and improvement account in excess of $3,500, it being understood, however, that this account does not include the $4,000 deposited on account of rent paid in advance.

"(VII) Both banks are agreed that upon the approval of this tentative proposition by their respective boards of trustees that they will forthwith proceed to carry out the necessary steps for the purpose of giving effect to this agreement, it being the purpose of the parties to effect an amalgamation of the two banks to do business under the name of German-American Mercantile Bank, as a state institution; and both banks understand that this agreement is not a final or complete agreement in detail, but that such other or further agreements to carry into effect the matters set forth in this proposition, or that would reasonably arise therefrom, will be executed.

"(VIII) It is understood that nothing herein contained shall be construed as requiring The Mercantile National Bank to turn over any notes or other obligations of doubtful value. It is further understood that said bank is to be liquidated, and that this agreement covers only the taking over of the good-will, accounts, notes, properties, and business of The Mercantile Na-

tional Bank, and that all of the present stockholders of The Mercantile National Bank will not be subscribers to the additional $100,000 of stock as provided for herein."

The exhibit "C" attached to the plan submitted (the proposed guaranty agreement) reads as follows:

"Know all men by these presents: That, Whereas, The undersigned are holders of the whole, or a majority, of the outstanding capital stock of the German-American Bank, a banking corporation organized pursuant to the laws of the State of Washington relating to the organization of banks under state charter; and,

"Whereas, In contemplation of liquidation, the officers and stockholders, or a part thereof, of The Mercantile National Bank, a national banking corporation doing business at Seattle, Washington, have agreed, so far as within their power and as may be consistent with the statutes of the United States, to turn over its present banking business, i. e., notes, obligations, investments, accounts, and good-will, in accordance with a plan outlined in a written memorandum understood by the officers of the German-American Bank, at such time as necessary steps can be taken under the federal statutes, and have also undertaken and agreed to subscribe for $100,000 worth of additional stock of the German-American Bank, its capital stock now being increased from $100,000 to $200,000, and all of the stockholders of the German-American Bank agreeing that the additional $100,000 worth of stock shall be subscribed by a part of the present stockholders or trustees of The Mercantile National Bank, as may be directed by its present board of trustees; and,

"Whereas, As a condition of the transfer of the good-will and business of The Mercantile National Bank to the German-American Bank, among other things, the stockholders and trustees of said bank subscribing said additional $100,000 worth of capital stock have made it a condition precedent to carrying through their agreement to transfer said business and subscribe said stock that the present stockholders of the German-American Bank, or a majority thereof,

execute a good and sufficient guarantee, guaranteeing to them, under such instruments as may be proper, that all of the loans and investments at present held by the German-American Bank are good and that there will be no loss thereon in excess of the sum of $12,500, have required, as a condition precedent to the carrying through of their part of said agreement, the execution of such an agreement of guarantee, and a further agreement, as additional security, that all dividends that may be declared upon the stock belonging to any of the undersigned in said German-American Bank, for the period covered thereby, may be applied towards making up any deficiency that may arise by reason of there being any loss upon any of the outstanding paper or other property of the German-American Bank in excess of the sum of $12,500; it being agreed that no liability will be asserted hereunder if there be no loss upon the existing paper or property of said bank in excess of the sum of $12,500, and it being further agreed that there is to be first applied upon any greater deficiency the amount of the surplus and net earnings of said German-American Bank as of date of the consummation of what may be termed the amalgamation of the two banks, which it is agreed shall be of date of turning over of the accounts and obligations of The Mercantile National Bank; and,

"Whereas, The undersigned and each of them acknowledge that the turning over by the stockholders and trustees of The Mercantile National Bank of its business, so far as the same may be done, and in the manner as outlined in the memorandum of agreement approved by the board of trustees of the German-American Bank, and the subscription by them of the additional $100,000 worth of stock in the German-American Bank, or its successor (it being understood that its capital stock is to be increased to $200,000 and its name changed to German-American Mercantile Bank), and the execution by the subscribers to said stock of a like agreement of guarantee with relation to the properties and assets turned over to the German-American Bank, is a valuable and sufficient consideration for the execution of this agreement; and,

"Whereas, In order to more effectually carry into effect the agreement of the undersigned, H. Middaugh, or his successor, has been appointed as trustee to represent and act for the stockholders of The Mercantile National Bank, as subscribers to the additional $100,000 of stock of the German-American Bank which is to be subscribed by them; and,

"Whereas, H. Middaugh, or his successor, has been duly designated by such stockholders of The Mercantile National Bank to act as trustee, for their use and benefit under the terms of this agreement;

"Now Then, These Presents Witnesseth: That for and in consideration of the benefits accruing to us and each of us by reason of the matters and things hereinbefore referred to, and for a valuable consideration, the receipt of which is hereby expressly acknowledged, the undersigned, and each of us hereby bind ourselves and each of us, in proportion to the stock subscription of the undersigned to the old capitalization of $100,000 in said German-American Bank, forthwith after six months' notice after demand in writing made by H. Middaugh, as trustee, or his successor, to pay to him from time to time the full amount of any loss in excess of the sum of $12,500, plus the undivided net earnings and surplus as of date of the actual consummation of the proper amalgamation, so-called, of the German-American Bank of Seattle, and The Mercantile National Bank, and arising, if at all, as the result of any bad or slow paper, or other investments now owned by the German-American Bank of Seattle, and the property of said bank at the time of the so-called amalgamation, and it is agreed that as soon as any loss in excess of said sum is ascertained demand may be made, and thereafter from time to time as loss may arise or as may be found proper by said trustee; and it is understood and agreed that the entry of judgment upon any obligations now held by said bank and the return of the sheriff of King county, Washington, or the officer of any other county in which suit is brought, of the fact that no property of the judgment creditor can be located, i. e., a return of *nulla bona*, shall be conclusive that the amount of the obligation so re-

duced to judgment is a loss, it being understood, however, that if by a two-thirds vote of the then board of trustees of the German-American Bank, or its successor, any paper or obligations be declared to be a loss, or if any paper is required to be charged off by the bank examiner, such action shall be conclusive evidence of such loss.

"It is understood and agreed, however, that said trustees may at any time demand that the officers of the German-American Bank, or its successor, shall cause any note, then in said bank, to be paid within a period of six months, or that additional security be given therefor, and if it is not so paid, or if additional security is not furnished, then he shall forthwith have the right to make demand to make the claim that said note or obligation is a loss; provided, however, said trustee named to operate under this guaranty, for The Mercantile National Bank, as now constituted, shall in the event that he is about to demand payment on any paper, or obligation in the manner mentioned in said instrument, call into consultation one of the directors representing at this time stock in the German-American Bank, and if said director agrees with him that the call shall be made it shall be forthwith made as provided. In the event, however, that said director disagrees with the trustee, one of the directors named by the stockholders of the new stock shall be called in conference, and if he agrees with the said trustee, said call shall forthwith be made, and if he disagrees said paper shall thereupon remain uncalled, unless subject to other action by two-thirds vote of the board of trustees thereafter, same is called.

"It is further agreed, and the president and other officers of the German-American Bank, or its successor, are hereby authorized upon notice and demand from said trustee (and this instrument shall be deemed sufficient to vest such power in said trustee), to apply towards any loss, if any, in excess of the amount hereinabove specified, on existing obligations of the German-American Bank, any dividends which may be declared from time to time upon the stock which we now own, and for such purpose we hereby transfer and as-

sign to such trustee all dividends that may be declared upon the stock which we and each of us now hold, said assignment to be effective only in case there be a liability hereunder; but nothing in this provision with relation to the assignment of dividends shall in any way be construed as preventing said trustee from making demand and taking such other action as he may think necessary and proper for the purpose of obtaining hereunder the necessary funds to take up any deficiency that may arise, limited, however, to the methods of calling the obligations herein outlined; and it is understood and agreed that as deficiencies, if any, arise, demand may be made, and that no demand or payment shall be construed to in any way release the undersigned or either of them from any future liability during the life of this agreement for other or additional demands. It is understood and agreed, however, that no demands shall be made for the payment hereunder from and after the first day of July, 1917, that is, that unless the loss is determined or ascertained prior to such date, then there shall be no further liability hereunder upon the undersigned or either of them.

"It is understood and agreed that this agreement is to be binding upon each of us, and our respective heirs, assigns, executors, and administrators, for all losses covered hereby severally in the proportion the stock owned by us in our respective names bears to the total of the stock represented by the signatures hereto, that is, our liability for all losses for which demand may be made from time to time hereunder shall be severally for the portion thereof as our respective holdings bear to the entire stock represented hereby, it being understood that this agreement is to be effective if signed by the owners or a majority of the owners of the present outstanding stock of the German-American Bank, and we and each of us undertake and agree and bind ourselves to pay, within a period of six months after each demand during the life of this agreement, severally the proportion of the indebtedness represented by said demand as our present stock-

holdings bear to the total stock represented by the signatures hereto.

"It is further understood and agreed that if payment is not made hereunder by us or any of us of our proportionate amount of said loss, as hereinabove provided, within six months after demand, then all unpaid demands shall bear interest at the rate of eight per cent per annum from the date upon which payment should be made; and it is further understood and agreed that if suit is brought to recover any demand or demands hereunder, then in every action so brought we and each of us bind ourselves to pay, in addition to the sum found due, a reasonable amount as an attorney's fee, such amount to be fixed by the court.

"We further undertake and agree to present our stock to a proper officer of the German-American Bank, or its successor, and agree that such officer may indorse thereon a memorandum impressing the same with the terms of this agreement.

"It is further understood and agreed that the subscribers to the additional $100,000 par of stock of the German-American Bank, or its successor, and who are protected hereby, may at any time, by a majority vote, name a new trustee, who shall be vested with the same authority and powers as the trustee named herein. It is understood and agreed that the trustee representing the stockholders of the now The Mercantile National Bank, who subscribe the additional $100,000 of stock, is to account to the German-American Bank, or its successor, for all sums paid or collected hereunder, less legitimate expenses incident thereto, that is, that the funds to be collected hereunder are to be collected for the use and benefit of the German-American Bank, or its successor.

"This agreement is to be delivered upon the delivery of I. J. Riley, as trustee for us and each of us, of an agreement of guaranty of similar import, and covering obligations and properties turned over or to be turned over by The Mercantile National Bank to the German-American Bank, or its successor, the German-American Mercantile Bank, together with an original subscription list containing the names of the subscrib-

ers to the new stock, and upon payment of the amount of $100,000 in cash to said German-American Bank, or its successors, the purchase price of said stock."

These instruments were submitted to the stockholders of the respective banks at meetings specially called to consider them, and were duly and regularly approved and adopted by the officers and stockholders thereof. Acting pursuant thereto, the German-American Bank, by appropriate proceedings, changed its name from German-American Bank to German-American Mercantile Bank, reduced the membership of its board of trustees to nine in number, increased its capital stock from $100,000 to $200,000, permitted the stockholders of the Mercantile National Bank to subscribe for the excess capitalization, took over the deposits and such of the notes and other assets of the Mercantile National Bank as the agreement contemplated, and, generally, complied with all of the terms of the agreement. In the meantime certain of its stockholders, the defendants in the present action, executed the guaranty agreement in the form as we have set it forth. As this suit pertains only to the guaranty of the stockholders of the German-American Bank, the action taken by the stockholders and officers of the Mercantile National Bank is not detailed in the complaint. It is alleged generally, however, that it went into voluntary liquidation, and that the "various provisions of the plan or proposition looking to the amalgamation of the business of the" two banks, including the execution of the reciprocal guaranty agreement, "were duly carried out." The proceedings had with relation to the reorganization of the German-American Bank, and the transfer to it of the assets of the Mercantile National Bank, were completed as of date August 29, 1914, and the reciprocal guaranty agreements were delivered to the respective trustees named

therein on the same day; the German-American Bank from thence on continuing its business under its new name of German-American Mercantile Bank.

On January 27, 1915, the state bank examiner required the bank to charge off from its listed assets, as unbankable paper, notes and other securities representing its loans and investments of a face value in excess of $30,000. These securities were among those held by the German-American Bank at the time of the amalgamation and were covered by the guaranty agreement. While the allegations of the complaint are to us not entirely clear concerning the matter, this seems to have been settled by deducting from the total sum of the assets found unbankable the sum of $12,500, the maximum sum not covered by the guaranty agreement, the surplus and net earnings of the German-American Bank on hand at the time of the amalgamation, and by the payment by the guarantors of the difference; thus absorbing all of the credits permitted the guarantors by the agreement. Under the dates of November 8, 1915, February 19, 1916, and December 30, 1916, the bank examiner required the bank to charge off other paper covered by the guaranty agreement, of the face value of $6,446. These notes were certified by the directors of the bank to the trustee named in the agreement as nonbankable paper, and demand was made by the trustee on the obligors therein for the payment of the amount thereof. No compliance was made with this demand.

On January 31, 1917, the German-American Mercantile Bank was found and declared to be insolvent by the bank examiner and possession of its assets was then taken by him. In the course of his administration of the bank's affairs, the bank examiner found other loans and investments carried by the bank, which were a part of the loans and investments of the

German-American Bank at the time of the amalgamation and which were turned over to the German-American Mercantile Bank at that time, to be uncollectible and a loss to the bank. The character and amounts of these are summarized in the complaint in the following manner:

| | |
|---|---|
| Notes | $44,267.77 |
| Real estate loans | 44,362.54 |
| Claims and judgments | 13,399.54 |
| Loss on real estate | 9,172.61 |
| Making a total of | $111,172.46 |

On May 23, 1917, these items were declared to be a loss, within the meaning of the terms of the guaranty agreement, by both the bank examiner and the board of directors of the German-American Mercantile Bank and certified as such to the trustee named in the agreement, and that person, on the same day, made demand on the obligors named in the agreement for payment. The demand was not complied with within the six months permitted by the guaranty agreement, nor at any time, whereupon the present action was begun, with the result before stated.

While extended briefs have been filed by the parties to the appeal, in which many questions are discussed, it has seemed to us that the primary and controlling question is, who is the real beneficiary of the guaranty agreement. On this question, it is the appellant's contention that the real beneficiary is the bank; that the obligors in the agreements are only the incidental beneficiaries thereof, and from this the conclusion is drawn that the bank could have sued upon the agreements, and, in consequence, the bank examiner can sue thereon as the representative of the bank. On the other hand, the respondents contend that the real beneficiaries are the obligors; that the bank is only

an incidental beneficiary thereof, and hence the bank never had, and could not have, a right of action on the agreements, and that no such right inures to the bank examiner.

To determine which of these respective contentions should be sustained resort must be primarily to the two contracts above set out, and especially to the second one. The first contract is referred to as the tentative agreement, and the other as the reciprocal guaranty agreement. The fact must be kept constantly in mind that it was the two banks that were amalgamated. The German-American Bank was taking over the paper, the business and the assets of the Mercantile National Bank, the latter bank expecting to go into liquidation. To effect this amalgamation the banks must act as entities, and in this capacity must speak through its stockholders in meetings regularly called for the purpose.

On the fifth day of August, 1914, a special meeting of the stockholders of the German-American Bank assembled pursuant to a call regularly issued. The minutes of this meeting are made a part of the complaint and show that the object of the meeting was to increase the capital stock of the German-American Bank to two hundred thousand, to change the name of the bank to that of the German-American Mercantile Bank, and to amalgamate with the bank the assets, business, and good will of the Mercantile National Bank. At this meeting resolutions were passed covering the proposed amalgamation and providing that the board of directors should comprise nine members instead of fifteen. The minutes of the meeting recite that the tentative agreement and the guaranty agreement were read paragraph by paragraph, were approved by the stockholders' meeting, and "were thereupon signed by the parties whose names appear on the

originals thereof, which were ordered spread upon the minutes of the meeting." The parties who signed these agreements are, with the exception of the wives, the parties to this action against whom recovery is sought.

The tentative agreement set out the proposed plan of amalgamation, and provides, in paragraph five, that the stockholders of the Mercantile National Bank who subscribed to the one hundred thousand stock in the German-American Mercantile Bank are to execute a good and sufficient guaranty to a trustee to be named by the stockholders of the German-American Bank, so as to insure "it" against loss upon the paper or obligations turned over by the Mercantile National Bank.

The stockholders of the German-American Bank were to execute a good and sufficient guaranty to a trustee to be named by the stockholders of the Mercantile National Bank who subscribed for the additional one hundred thousand stock of the German-American Mercantile Bank, under which they shall guarantee "said bank" against loss upon the paper then held by that bank.

If the tentative agreement were alone to be considered, it could hardly be doubted that the intention was to make the German-American Mercantile Bank the beneficiary of the agreement. In fact, the language here used is that the bank is to be guaranteed against loss; but, since the action necessarily is based primarily upon the reciprocal guaranty agreement, attention must be given to the language used in that contract. It consists of two parts, one part containing recitals and the other the obligations. In the recital part, which in effect recapitulates the plan of amalgamation or merger, there is some language which, if it stood alone, such as an expression, "guarantee to

them," would indicate that the guaranty was for the benefit of the stockholders subscribing to the one hundred thousand dollars' worth of the increased capital stock of the German-American Mercantile Bank. In the obligatory part of the contract it is recited, in the first paragraph, that, for and in consideration of the benefits accruing to us, and each of us, by reason of the matters and things hereinbefore referred to, and for a valuable consideration, the undersigned, and each of us, bind ourselves, in the manner therein set out, to make good any loss that may occur upon the paper held by the German-American Bank at the time of the amalgamation.

A method is provided by which to determine when the paper shall be considered a loss, and by which such loss may be collected from the parties signing the agreement. It is further provided that the signers of the agreement were to present their stock to a proper officer of the German-American Bank "and agree that such officers may indorse a memo therein impressing the same with the terms of this agreement." In pursuance of this provision, it is alleged that all the papers (notes) owned by the German-American Bank at the date the amalgamation was consummated, to wit, August 29, 1914, was, by the officers of the German-American Mercantile Bank, impressed with the terms of the guarantee agreement, there being placed upon all the paper and notes, including the paper received from the Mercantile National Bank, the abbreviation "Gr"; and the paper which both banks held at the time of the amalgamation was carried by the German-American Mercantile Bank in this form, and was held out to the state bank examiner as guaranteed paper.

The agreement further provides that "it is understood and agreed that the trustee representing the stockholders of the now Mercantile National Bank who

subscribed the additional one hundred thousand dol-
lars of the stock is to account to the German-American
Bank or its successor for all sums paid hereunder, less
legitimate expenses thereto. That is, that the funds
to be collected hereunder are to be collected for the
use and benefit of the German-American Bank or its
successors." Here is a direct provision that the money
collected under this agreement is to be accounted for
to the German-American Bank, and the funds so col-
lected are "to be collected for the use and benefit of
the German-American Bank." The paper covered by
the guaranty was owned by the bank, which had a di-
rect interest in its collection. The funds collected
under the guaranty were to be paid to the bank.
Under this state of facts, the bank was the direct bene-
ficiary of the guaranty agreement. The stockholders,
of course, who signed the agreement were also inter-
ested in keeping the paper of the bank good, but it
was the bank as an entity which was primarily to be
benefited by the collection. Indirectly, there would be
a resultant benefit to the stockholders. Under the rule
stated in *Tacoma Mill Co. v. Northern Pac. R. Co.*, 89
Wash. 187, 154 Pac. 173, these two agreements, being
executed at the same time, should be considered to-
gether. If the reciprocal guaranty agreements were
inconsistent with the tentative agreement, the pro-
visions of the former, it may be admitted, would con-
trol. As already stated, under the tentative agree-
ment, there can be no question but what the intention
was to have the guaranty run to the bank and make
it the beneficiary of the agreement. Reading the two
instruments together, they do not appear to be incon-
sistent. There is nothing in the guaranty agreement
which requires a construction that the beneficiary was
to be the stockholders and not the bank. Language
used incidentally in the recitals thereof cannot be held

to be controlling over the direct provision in the obligatory part. Even though the tentative agreement were disregarded, and attention was given only to the guaranty agreement, the result would not be different, because a proper construction of that agreement is that it is made for the benefit of the bank, and that the bank is the direct beneficiary thereof.

The guaranty agreement being made for the benefit of the bank, the question arises whether the state bank examiner may sue upon it. Under § 179 of Remington's Code, it is provided that every action shall be prosecuted in the name of "the real party in interest," except as is otherwise provided by law.

By a long line of decisions, which will be found collected in *Hart v. Bogle,* 88 Wash. 125, 152 Pac. 1010, this court is committed to the doctrine that, where one person, for a valuable consideration, makes a promise to another to pay the debt of a third person, such third person may maintain an action in his own name upon the promise, and against the promisor alone. The bank, being the direct beneficiary of the guaranty agreement, must be held to be the real party in interest. If the bank be the real party in interest, there can be no question that, after insolvency and the bank being taken over by the state bank examiner, that official may maintain an action upon the agreement. *Hanson v. Soderberg,* 105 Wash. 255, 177 Pac. 827; *Briscoe v. Hamer,* 50 Okl. 281, 150 Pac. 1101; *Montgomery Bank & Trust Co. v. Walker,* 181 Ala. 368, 61 South. 951.

The case of *Punta Gorda Bank v. State Bank of Fort Meade,* 52 Fla. 399, 42 South. 846, is very much like this, except that there the action was brought by the bank itself. The situation presented in that case and the holding of the court can be best understood by a liberal quotation from the opinion:

"It appears from the allegations of the declaration that the defendant and others owned the stock of the Punta Gorda Bank, which was a branch bank of the defendant. These parties thought it best for the banking interests of Punta Gorda to increase the capital stock of the latter bank from $5,000 to $15,000, and to incorporate it as a separate, independent institution. McAdow contemplated putting in the new bank the additional $10,000, or procuring others to do so, and the new bank was to take over the securities of the one it succeeded; but McAdow was uncertain as to the value of certain of the securities, especially the note of Hinkley for $4,500. To induce McAdow to go into the new bank, or induce others to do so, and put in the additional $10,000, the defendant and other stockholders of the branch bank at Punta Gorda executed a written instrument guaranteeing all the securities held by the branch bank at the face value against any loss by failure to collect said securities. This guarantee was executed on or about the 31st of December, 1898. In consideration of this guaranty $10,000 was added to the capital of the Punta Gorda Bank, and in pursuance of it the new bank, the plaintiff in this case, was organized and took over all the assets of the branch bank, including the Hinkley note, which in the meantime had matured, and Hinkley, with the consent of the defendant, had executed a renewal note, due on demand after date for $4,500 with 10 per cent interest. The Hinkley note proved valueless to the plaintiff, the new bank, and it sues on the guaranty. Construing this contract of guaranty in the light of the circumstances surrounding the parties, it seems to us that it was the intent of all the parties that the guaranty should so strengthen the financial position of the new bank as to induce McAdow to become interested in it, and therefore it was executed for the benefit of the new bank. McAdow and all other stockholders in the new bank were incidentally benefited by the guaranty, but its primary object was the benefit of the new bank. Taking this view, we think the plaintiff had the right to sue on this guaranty. It is not contended here that McAdow did not accept the proffered guaranty, or

that the defendant did not have notice of such acceptance, and the facts alleged very clearly imply, we think, that the guaranty was accepted by McAdow, and that the defendant had notice of the acceptance.

"The contention by the defendant in error is that no one but McAdow could sue on the contract of guaranty; that no contractual relations existed between the plaintiff and the defendant, and that no consideration is shown to support a contract between the parties, and, therefore, there is no valid contract. It seems to us that there was a clear benefit to be derived by the defendant and the stockholders of the branch bank from getting McAdow with his $10,000 into the new bank. It could have had no other effect than to give stability to the value of their stock, if it did not materially increase it, by enlarging the capacity of the bank for carrying on its business. This element of advantage was a sufficient consideration to support the contract. Furthermore, McAdow, by accepting the guaranty and putting his money, or procuring others to put in money, gave full consideration for the guaranty. *Ferst v. Blackwell*, 39 Fla. 621, 22 South. 892. If the contract was intended for the benefit of the new bank, as we think it was, then there can be no question that it has a right to sue upon it. *Wright v. Terry*, 23 Fla. 160, 2 South. Rep. 6; 7 Am. & Eng. Ency. Law (2nd Ed.), pp. 106-108 and notes. This was not the doctrine of the common law in a case like this and perhaps is not the rule in several American states, but under statutes like ours, authorizing the real party in interest to sue (section 981 of Rev. Stats. of 1892), we think the question is settled."

It has been suggested that the agreement of guaranty in that case was to the new organization, but even if this be true, it does not destroy the case as an authority. There can be little difference between the effect of such an agreement, and one which makes the bank the direct beneficiary of the proceeds.

The case of *Horstman Co. v. Waterman,* 103 Wash. 18, 173 Pac. 733, 1 A. L. R. 856, is relied upon as·sus-

taining the respondent's contention that the bank was not the real party in interest, and that therefore the bank examiner has no right to maintain the action. But that case is distinguishable from the present in at least one material respect. There the creditor seeking to bring the action upon a guaranty agreement was not a party to the inducing consideration for the agreement. Here, before the amalgamation could take place, the bank must act, speaking through its stockholders. The bank, as an inducement and consideration for the amalgamation, increased its capital stock from one hundred thousand dollars to two hundred thousand dollars, changed its name from that of the German-American Bank to that of the German-American Mercantile Bank, reduced the number of its trustees to nine, and further provided that the agreements should be spread upon its records as a part of the minutes of the stockholders' meeting.

It is not the intention in that case to overrule the line of decisions of this court cited in *Hart v. Bogle, supra,* and adopt the rule of *Vrooman v. Turner,* 69 N. Y. 280, in modified form. There is a general reference to the early decisions of this court, in the opinion, but the line of cases referred to in *Hart v. Bogle* was not there mentioned. The *Vrooman* case is disapproved of in *Corkrell v. Poe,* 100 Wash. 625, 171 Pac. 522, and the rule of the cases cited in *Hart v. Bogle* is approved. But whatever effect may be given to the language in *Horstman Co. v. Waterman,* as already pointed out, upon the facts, that case is substantially different.

It has been suggested that the reciprocal guaranty agreements could have been rescinded and annulled with the consent and cooperation of the signers and trustees; but the rule is, that the parties to an agreement made for the benefit of a third party, if accepted

by that party, cannot themselves annul the contract by mutual releases. *McConaughy v. Juvenal,* 73 Wash. 166, 131 Pac. 851; *Tweeddale v. Tweeddale,* 116 Wis. 517, 93 N. W. 440, 96 Am. St. 1003, 61 L. R. A. 509; *American Central Life Ins. Co. v. Rosenstein* (Ind. App.) 88 N. E. 97; *Id.,* 46 Ind. App. 537, 92 N. E. 380; *Eitscheid v. Baker,* 112 Wis. 129, 88 N. W. 52.

Under that rule, the reciprocal guaranty agreement could not be annulled without the consent of the bank. It had assented to the agreements and was a party to the inducement and consideration which prompted them.

There are other questions suggested in the briefs, but we think that the questions already discussed and decided are controlling. Any further comment would unnecessarily extend this opinion, which is already unreasonably long.

The judgment will be reversed, and the cause remanded with directions to the superior court to overrule the demurrers.

Reversed.

HOLCOMB, C. J., BRIDGES, MACKINTOSH, and MOUNT, JJ., concur.